STATE OF NORTH CAROLINA Ex Rel. NORTH CAROLINA UTILITIES
COMMISSION v. MUNICIPAL CORPORATIONS OF SCOTLAND NECK,
HERTFORD, ENFIELD, EDENTON, ELIZABETH CITY, WINDSOR,
BELHAVEN, AND ROBERSONVILLE.

(Filed 14 December, 1955.)

**1. Electricity § 3—**

Where a power company sells electric energy in several states, it is
desirable that its schedules of rates be uniform within the entire territory'
served by it so long as such rates will not give an excessive return on the
investment of the utility in any particular jurisdiction or be unjustifiably
high in any jurisdiction served by it.

**2. Same—**

A municipality retailing electric energy in its proprietary capacity for a
profit utilized for public purposes is not a nonprofit-making corporation in
the same sense as an electric membership corporation, nor does it operate
under the same conditions, since an REA cooperative must construct and
maintain lines through sparsely settled rural areas, and therefore, such
differences justify a lower rate schedule for REA cooperatives in conform-
ity with public policy.   G.S. 117-10.

**3. Same—**

A party may not attack a rate schedule for a certain classification of
consumers of electric energy on the ground of discrimination in that energy
sold under such schedule would be at a loss which would have to be made
up by other customers of the power company, when such party does not
seek the cancellation or increase of such rate, but seeks to obtain electric
energy under the identical rate it contends is discriminatory.

**4. Same—**

The difference in the respective peak loads of municipal and industrial
consumers of electric energy is sufficient to justify placing them in different
classifications for rate-making purposes.

**5. Same—**

While there must be no unreasonable discrimination in the schedule of
rates charged for the same kind and degree of service, any matter which
presents a substantial difference between customers, such as quantity used,
time of use, or manner of service, may be proper ground for classification
for rate-making purposes.

**6. Utilities Commission § 3—**

In determining fair rates to be charged by a power company, evidence
of rates charged by another company in the same territory is properly
excluded when there is no evidence of relative cost conditions.

**7. Electricity § 3—**

A purchaser of electric energy has no vested right in a schedule approved
by the Utilities Commission, and whether a utility will be permitted to
withdraw an existing schedule of rates is a matter for determination of
the Commission in accordance with law.

7—243

**8. Same—**

Where ·the Utilities Commission finds, upon supporting evidence, that a power company is entitled to increase in rates, it is incumbent upon the Commission to approve schedules that in its opinion will be fair and equitable as between the established classifications of customers to be served, and in so doing, it may withdraw a schedule based upon contracts having no fuel clause, and require all customers coming within the same classification to pay rates fluctuating with the cost of fuel so that the rate will be uniform for all within the same classification.

**9. Utilities Commission § 3—Informal conference held without notice was not a formal hearing and appellants were not prejudiced by order based thereon.**

Pursuant to an inquiry during the hearing as to whether a municipality selling electricity at retail would be entitled to purchase electric energy under the commercial rate if it acquired a customer within its territory entitled to the commercial rate, a private conference between the Commission and the power company was held, and as a result thereof, the Commission approved a rider authorizing the commercial rate in such case to a municipal customer for any energy sold by it to such commercial user. Upon objection by municipalities, the power company offered to withdraw the rider, and counsel for the protesting municipalities refused the offer. *Held:* While the informal conference without notice to counsel for the municipalities was unfortunate, it does not invalidate the order of the Commission, since the conference was not a formal hearing within the meaning of G.S. 62-23, and the municipalities were not prejudiced thereby.

**10. Same—**

An order of the Utilities Commission giving municipalities the option to purchase electricity for industrial customers at a lower rate, but expressly providing that the municipalities should be free to contract with such industrial customers with respect to the price they would be required to pay the municipalities for the electric energy purchased by them, does not violate G.S. 62-30 (3).

**11. Same—**

In a hearing before the Utilities Commission to fix rates for electric energy, reports made by municipal customers to the Utilities Commission pursuant to G.S. 62-98, are properly received in evidence as exhibits and made part of the record as authorized by G.S. 62-18, such evidence being competent on the question of whether the proposed schedules are fair and equitable to the municipal customers, though not relevant on the question of the power company's right to a general increase in rates.

**12. Utilities Commission § 5—**

G.S. 62-26.10 and 62-123 make the rates fixed by the Utilities Commission not only *prima facie* evidence of their validity, but also that they are just and reasonable.

APPEAL by protestants from *Carr, J.,* November Term, 1954, of EDGECOMBE.

This proceeding originated upon the written application of Virginia Electric and Power Company, hereinafter called Vepco or company, for a general increase in electric rates in North Carolina, which application was filed on 27 October, 1953, with the North Carolina Utilities Commission, hereinafter referred to as the Commission.

The appellants are the protesting municipal corporations of Scotland Neck, Hertford, Enfield, Edenton, Elizabeth City, Windsor, Belhaven and Robersonville, hereinafter referred to as appellants or protestants.

The application for an increase in rates as originally filed on 27 October, 1953, sought increases in rates estimated by Vepco to produce approximately $297,000 of additional annual revenues from the company's North Carolina operation. Prior to the beginning of the hearing before the Commission on 24 February, 1954, Vepco made modifications in its application for increased rates in North Carolina so that the application as modified sought increases in rates estimated to produce $235,000 of additional annual revenues from its North Carolina operation instead of the $297,000 originally requested.

This cause was heard before his Honor Leo Carr, Judge Presiding, at the November Term, 1954, of the Superior Court of Edgecombe County, North Carolina, upon the appeal of the eight protestants from the final order of the Commission dated 1 June, 1954, and the Commission's order dated 8 July, 1954, denying the petition for a rehearing filed by said protestants. By agreement of counsel for the respective parties it was stipulated that judgment in this cause might be signed and entered by Judge Carr out of the district and out of the term.

On 16 March, 1955, Judge Carr signed a judgment affirming the final order of the Commission, and its order denying petition to rehear, and directing the clerk to tax the costs jointly against the eight appellants. From this judgment the protestants appeal, assigning error.

*Lassiter, Leager & Walker for appellants.*

*Joyner & Howison, Hunton, Williams, Gay, Moore & Powell, and John W. Riely and T. Justin Moore, Jr., for Vepco, appellee.*

DENNY, J.    This appeal presents the following questions for determination:

1. Was the action of the Commission erroneous when it refused to establish rates for sales to municipalities for resale identical with rates for sales to rural electric cooperatives, although conditions of the sales differed and no sales to cooperatives were in fact being made?
2. Was the action of the Commission erroneous when it refused to require service to a municipality for resale (with relatively low

load factor and relatively high peak loads at the time of the company's system peak load) at a rate designed for service exclusively to industrial customers (with relatively high load factor, and, in general, no relatively high peak loads)?

3. Was the action of the Commission erroneous when it refused to accept evidence of the rates of other utilities where no evidence of relative cost conditions was offered?

4. Was the action of the Commission erroneous in permitting the company to withdraw special schedules providing rates for sales to municipalities for resale when the company proposed and the Commission permitted the continuance of sales to such municipalities at general rates open to any customer?

5. When, at the request of the Commission, representatives of a utility met after the hearing with the Commission, in the absence of representatives of the protestants, to work out the language of a rate schedule rider favorable to protestants, may the protestants whose rights were not in fact prejudiced and who refused to acquiesce in the withdrawal of the rider successfully assert that the order approving that schedule be reversed?

6. Does "Rider G" purport to fix the rate at which the protestants would be required to sell electricity to industrial corporations in violation of G.S. 62-30 (3)?

7. Did the Commission err in receiving evidence as to the profits of the protesting municipal corporations from the resale of electricity purchased from Vepco?

The appellants have taken no exception to those parts of the order of the Commission or of the judgment of the Superior Court in which it is found or concluded that (a) the total revenues to be derived under the proposed new rates as approved by the Commission are not excessive, and (b) that the permitted rate of return allowed by the Commission is not excessive. Therefore, the entire controversy on this appeal with respect to rates is based on the contention of the appellants that the schedules of rates made applicable to the protesting municipalities are unreasonable, excessive and unlawfully discriminatory as between them and the schedule in effect for REA Cooperatives and the new schedule of rates for large industrial users purchasing a minimum of 5,000 kw monthly.

Consequently, it will be unnecessary for us to incorporate in our opinion the evidence bearing on the necessity for the requested increase in order that Vepco may earn a fair and just return on its investment. The Commission has found as a fact that Vepco is entitled to the increase of $235,000 per year and that such increase will give Vepco an

annual rate of return on its North Carolina properties of only 3.96 per cent, and that such return is "not more than a fair return." Such a finding, upon appeal to the Superior Court, "shall be *prima facie* just and reasonable." G.S. 62-26.10; *Utilities Commission v. Ray*, 236 N.C. 692, 73 S.E. 2d 870; *Utilities Commission v. Coach Co.*, 224 N.C. 390, 30 S.E. 2d 328. Likewise, any rates or charges established by the Commission "shall be deemed just and reasonable." G.S. 62-123; *In re Utilities Co.*, 179 N.C. 151, 101 S.E. 619.

Vepco is a Virginia corporation with its principal office in Richmond. It provides electric service for 19 counties in North Carolina; 67 in Virginia, and five in West Virginia. The company serves more than 600,000 electric customers in an area of approximately 32,000 square miles. The company began its service in North Carolina in 1926 when it purchased the Roanoke Rapids Power Company at Roanoke Rapids, and the Roanoke River Development Company at Weldon. At the end of 1926 it had only 1,718 customers in this State. By September 1953 it had slightly over 36,000 customers in North Carolina, not including the customers in the towns which purchased current wholesale from the company.

The company offered evidence tending to show that the value of its system was fixed at $14,500,000 by the Virginia Commission in 1921, and that its net investment as of 30 September, 1953, had increased to approximately $324,790,000; and that $26,313,000, or eight per cent thereof, represented the net investment allocated to North Carolina, and about two per cent represented the net investment allocated to West Virginia, leaving approximately ninety per cent allocated to the State of Virginia.

Prior to the filing of its request for the increase of rates in North Carolina, the company had in effect in North Carolina 23 schedules and nine riders. Certain of these schedules were obsolete, no energy being sold under them, while others contained no fuel clause, that is, no provision resulting in automatic increase or decrease in rates as the cost of fuel rises or falls. On the other hand, schedules under which the larger users purchased electric current contained fuel clauses. Hence, the customers purchasing electricity under these latter schedules, by reason of the increase in the price of coal, had already had the cost of current increased substantially before the present application for an increase was filed. Those customers, under schedules that contained no fuel clause, have been obtaining current at rates approved by the Commission when the cost of coal was approximately $4.00 per ton, or less than one-half the current price.

The effect of a fuel clause may be demonstrated by a comparison of the rates at which the towns of Edenton and Scotland Neck have been

purchasing electric current under the old schedules. Edenton has had a contract under Schedule 9, which had a fuel clause, and had to pay an average cost per kwh of 1.13c for the test period; while Scotland Neck had a contract under Schedule 18, which had no fuel clause, and was obtaining its electricity at an average cost of 1.03c per kwh. As a result of this disparity, Edenton, which had a much better load factor and a higher electric energy consumption, was paying more for its electricity per kwh than Scotland Neck. Likewise, Elizabeth City, according to the evidence, had a fuel clause in its contract and while it used approximately five times the amount of electricity Scotland Neck used, and had a higher load factor, paid an average of 1.05c per kwh. Six of the eight protestants had been obtaining electricity under schedules without a fuel clause. Elizabeth City and Edenton have been obtaining their electricity under schedules containing fuel clauses. Therefore, it is apparent that the six protesting municipalities which have been receiving electricity under schedules not containing a fuel clause have been paying rates which were discriminatory in their favor against towns served under a schedule with the fuel clause.

There is evidence that from 1926 to the date the present application for an increase was filed, there had been no increase in Vepco rates in North Carolina except by virtue of the effect of the "fuel clause" which was permitted due to the increased cost of coal. This clause was made applicable to certain large users. Vepco in its application to the Commission requested the Commission to authorize it to cancel certain schedules and riders in effect in North Carolina and to substitute uniform rate schedules identical with those filed with the State Corporation Commission of Virginia and with the Public Service Commission of West Virginia, in order that the rates under the respective schedules might be uniform over the entire Vepco system. Certainly, such uniformity is desirable so long as such rates will not give an excessive return on the investment of the utility in any particular jurisdiction in which it serves, or be unjustifiably high in any jurisdiction served. *Smith v. Ames,* 169 U.S. 466, 42 L. Ed. 819.

The Commission allowed Vepco to continue in effect the following existing rate schedules and service agreements: (a) Schedule No. 12, 409-NC and 409-A-NC; (b) Municipal Electric Service Agreement; and (c) County Electric Service Agreement, and to withdraw all other schedules in effect in North Carolina and to place in effect the following schedules and riders: (a) Residential, No. 1; (b) Small Commercial, Nos. 4 and 5; (c) Large Commercial and Industrial, Nos. 4, 5, 8, 9, 10 and 11; (d) Miscellaneous, Nos. 17, 20 and 24; and (e) Riders D, F and G.

The test period used in the hearing before the Commission was based on the twelve months ending 30 September, 1953. According to Vepco's testimony, the rate of return for its entire system during the test period was only 5.22 per cent and in North Carolina only three per cent. That the requested $4,800,000 of additional gross revenue for the system as a whole would, after deduction of Federal income taxes and State and local taxes, increase the net earnings only $2,201,000, which would give a return of 5.87 per cent, a rate deemed fair both to the company and its customers by the State Corporation Commission of Virginia. The order of the Virginia Commission allowing the requested increase was upheld by the Supreme Court of Appeals of Virginia in the case of *Bd. of Supervisors v. Virginia Electric & Power Co.,* 196 Va. 1102, 87 S.E. 2d 139.

According to the evidence, under the schedules that remain in effect in North Carolina, together with the new ones approved by the Commission, Vepco's annual gross income in North Carolina will be increased by $235,000, and its net income, after deduction of taxes, will be increased by $98,000.

On 30 September, 1953, Vepco had 31,259 residential customers in North Carolina. Under the new schedules now in effect, pursuant to the order of the Commission entered on 1 June, 1954, 8,409 of these customers will have their bills reduced and 22,850 will have increases. Vepco had 5,156 commercial and industrial customers in North Carolina on 30 September, 1953. In the small commercial group numbering approximately 5,000 customers, 2,500 will receive a decrease and 2,262 will receive increases, and others in this group will not be affected by the change.

The $235,000 additional revenue to be derived annually from Vepco's North Carolina operation will be obtained under the following schedules: Residential, No. 1, $145,000; Small Commercial, Nos. 4 and 5, $15,000; Large Commercial and Industrial, Nos. 4, 5, 8, 9, 10 and 11, $66,000; and Miscellaneous, Nos. 17, 20 and 24, $9,000.

We shall consider the questions posed on this appeal in the order stated:

### I.

The protestants contend they are entitled to rates comparable to those available to the Electric Membership Corporations under Schedule No. 12, 409-NC and 409-A-NC, since they, like the cooperatives, buy electricity wholesale for the purpose of resale. They also contend that they are nonprofit public corporations which devote the net revenue derived from the sale and distribution of electric energy to the use and benefit of the citizens of the respective municipalities.

It must be conceded that the protesting municipalities are buying and selling electric energy in their proprietary capacities and that the profits derived therefrom are being used for the benefit of the citizens of the respective municipalities. However, we do not concede that such proprietary operations constitute public nonprofit corporations comparable to the Electric Membership Corporations.

The General Assembly of North Carolina, in 1935, created an agency to be known as the North Carolina Rural Electrification Authority. The purpose of the legislation is set forth in Chapters 288 and 291 of the Public Laws of 1935. These chapters, as amended, are now codified in Chapter 117 of our General Statutes as 117-1 through 117-28. G.S. 117-3 denies REA the right to fix rates or service charges, but gives to the Utilities Commission of North Carolina the power to fix the rates or service charges, or to order the extension of lines by the power companies. Also, G.S. 117-10, pointing out the manner in which Electric Membership Corporations may be organized, reads as follows: "Any number of natural persons not less than three may, by executing, filing and recording a certificate as hereinafter provided, form a corporation not organized for pecuniary profit (but) for the purpose of promoting and encouraging the fullest possible use of electric energy in the rural section of the State by making electric energy available to inhabitants of the State at the lowest cost consistent with sound economy and prudent management of the business of such corporations."

No limitation of the power to fix rates or to limit the margin of profit has been imposed on municipalities engaged in the distribution of electric energy in this State.

The North Carolina legislation with respect to Electric Membership Corporations, was enacted to implement the Act of Congress creating the Rural Electrification Administration, USCA, Title 7, sections 901-15.

According to the order of the Commission, the schedule under which the REA Cooperatives may be served, fixed a rate of 7½ mills which was approved many years ago at the request of the Federal Government for the purpose of developing rural sections of North Carolina by extending to such areas the benefits and advantages of electricity. The Commission said, among other things, in its order, "The municipalities in their protest seemed to feel that this low rate which the Company is charging the REA Cooperatives resulted in a higher rate which the municipalities were asked to pay. We are quite certain that this position of the municipalities is not well taken for the reason that if the Company had to construct the various transmission lines and extend electric service to the various sections of their territory which are now served by the REA Cooperatives, that the over-all operating expenses of the Company would be greatly increased and the other customers

would have to pay more to compensate for the loss sustained in serving the same rural customers direct. We therefore find as a fact that the protesting municipalities are not entitled to the REA rates. Furthermore, this discussion is rather academic at this time for the reason that while said schedule applicable to REA Cooperatives is still extant, yet the Company does not serve one single cooperative in North Carolina. All of the cooperatives in North Carolina, in the area served by the Company, are now served from the Kerr Dam under a contract with the Federal Government, and the Company only receives a 'wheeling' fee from transmitting said current from the Kerr Dam to the several cooperatives."

Moreover, these protestants contend that the schedule under which the REA Cooperatives might be served, if they should cancel their present contract with the Federal Government under which they now obtain their electric energy from the Kerr Dam, is discriminatory and that any energy sold under such schedule would be at a loss, and such loss would have to be made up by Vepco's other customers. Yet, they do not request that the rate fixed by this schedule be canceled or increased. On the contrary, while they condemn the schedule on one hand as being discriminatory and unlawful, at the same time they seek to obtain thereunder the identical rate they contend is discriminatory. Their position is untenable. Therefore, the conclusion of the Commission that these protestants are not entitled to the REA rate will be upheld.

The Virginia State Corporation Commission held in *Re Old Dominion Electric Cooperatives,* 86 P.U.R. (N.S.) 129 (Va. S.C.C. 1950), that "A utility may properly charge different rates to different classes of consumers and it is proper to put electric cooperatives in a class by themselves. They are nonprofit membership corporations organized under the Electrical Cooperative Act which was passed by the general assembly for the purpose of encouraging the distribution of the blessings of electrical energy as widely as possible among the people of Virginia. The public policy of the State is to help the cooperatives to succeed, and granting them the lowest possible rate for power is not only permissible but a necessary means to that end. No public utility earns the same rate of return on every class of service that it renders." This principle has been recognized and followed by utilities commissions in a number of states. *Wisconsin State Rural Electrification Coordination Committee v. Wisconsin Gas & Electric Co.,* 17 P.U.R. (N.S.) 31 (1936); *Re Wholesale Rates for Power to Rural Cooperatives,* 19 P.U.R. (N.S.) 22 (Ky. P.S.C. 1927); *Highlands Utilities Co. v. Western Colorado Power Co.,* 48 P.U.R. (N.S.) 180 (Colo. P.U.C. 1943); *Re Oklahoma Gas & Electric Co.,* 57 P.U.R. (N.S.) 159 (Okla. C.C. 1944). In a recent deci-

sion, the Illinois Commerce Commission, in acting upon an application of the City of Salem, Illinois, which decision was rendered 17 July, 1955, and reported in C.C.H. Utilities Law Reporter, section 16831, said: "Municipalities are not in the same class with rural electrification cooperatives. It is entirely appropriate for a public utility to classify municipally-owned public utilities in a class separate and distinct from rural electrification cooperatives for the purpose of determining rates and classes of customers to whom service is rendered."

The conditions under which REA Cooperatives must operate, the necessity for constructing and maintaining miles and miles of lines through sparsely settled rural areas, and the consequent line losses, are sufficient to justify serving municipalities engaged in selling electric energy for profit under a different schedule from the one applicable to the REA Cooperatives which are created and operated on a nonprofit basis pursuant to the established public policy of the State and Federal Government.

II.

Under the new schedules the protestants must obtain their electric energy for resale under Schedules Nos. 9 or 10; Schedule No. 9 being applicable to any customer contracting for 100 kw or more; Schedule No. 10, which is applicable to any customer contracting for 1,000 kw or more; while Schedule No. 11 is applicable to any industrial customer contracting for 5,000 kw or more.

The protestants take the position that Schedule No. 11 authorizes rates to industrial customers that are discriminatory. Schedule No. 11 is a new schedule in North Carolina, but a similar schedule has been in effect in Virginia for a number of years. Therefore, it is necessary to consider the use characteristics and load factors as well as the amount of electricity purchased under these respective schedules in order to determine whether or not there is a justifiable basis for the establishment of the different rate schedules.

During the test period, Belhaven had a load factor of 40.28 per cent; Robersonville of 42.28 per cent; Hertford of 45.11 per cent; Scotland Neck of 47.22 per cent; Enfield of 47.52 per cent; Edenton of 51.73 per cent, and Elizabeth City of 57.13 per cent. This information is not available as to Windsor. Elizabeth City has a daily demand of some 6,000 kw; therefore, it is the only one of the protestants whose daily demand is sufficient to comply with the demand required in Schedule No. 11. However, the use characteristics and load factors of Elizabeth City are substantially the same as in other towns. The Halifax Paper Corporation is the only industry in North Carolina in the area served by Vepco which can qualify under Schedule No. 11. During the test

period, Halifax Paper Corporation had a load factor of 82.8 per cent and consumed almost as much electric energy as the combined consumption of the eight protesting municipalities. Halifax Paper Corporation paid, during the test period, for electricity, $655,485.81, and the combined total paid by the eight towns for the same period for electricity was $683,741.43; whereas Halifax Paper Corporation received all of its electric energy at its plant, the eight towns are scattered over an area of more than one hundred square miles.

It is common knowledge that a residential consumer uses on the average about the same amount of electricity each day, but the consumption is not constant throughout the day. The peak period of a residential consumer usually comes at the time when meals are being prepared and during the early hours of the night. But, the utility furnishing energy to its customers must invest sufficient money in its plant and equipment to meet the peak demands of its customers, and when the load falls below the peak, the utility obtains payment only for the percentage of the peak load actually consumed.

We think the evidence with respect to the load factor as between the protesting municipalities and the industrial user, is sufficient to justify placing them in different classifications. We said in *Utilities Commission v. Mead,* 238 N.C. 451, 78 S.E. 2d 290, "There must be substantial differences in service or conditions to justify difference in rates. There must be no unreasonable discrimination between those receiving the same kind and degree of service. *Horner v. Electric Co.,* 153 N.C. 535, 69 S.E. 607; *Postal Tel.-Cable Co. v. Associated Press,* 228 N.Y. 370"; *Salisbury & S. R. Co. v. Southern Power Co.,* 179 N.C. 18, 101 S.E. 593; *Hilton Lumber Co. v. A. C. L. R. R.,* 141 N.C. 171, 53 S.E. 823; G.S. 62-70.

It is said in *Brown v. Penn. Public Utilities Comm.,* 153 Pa. Super. 58, 31 A. 2d 435, "The charging of different rates for service rendered under varying conditions and circumstances is not unlawful." It is likewise said in *Ford v. Rio Grande Valley Gas Co.,* 141 Tex. Rep. 525, 174 S.W. 2d 379, "Any matter which presents a substantial difference as a ground for distinction between customers, such as quantity used, time of use, or manner of service, is a material . . . factor. *American Aniline Products v. Lockhaven,* 288 Pa. 420, 135 A. 726, 50 A.L.R. 121. Quantity used is an important one."

### III.

The protestants contend that the Commission committed error when it refused to admit evidence of the rates charged by the Carolina Power and Light Company in eastern North Carolina when no evidence of relative cost conditions was offered.

The same question came before the Supreme Court of Appeals of Virginia when it considered the very rates at issue in this case. The Virginia Court said: The appellant ". . . charges . . . that the authorized rates are higher than those charged by the Potomac Electric Power Company for electric energy in the same area . . ." The Court then disposed of the charge in the following language: "No evidence was presented showing the cost conditions under which the Potomac Electric Power Company operates. Therefore, no proper comparison may here be made with its rates." *Bd. of Supervisors v. Virginia Electric & Power Co., supra.* The ruling of the Virginia Court is in accord with the decision of the Supreme Court of the United States in the case of *Smith v. Ames, supra.* The protestants' exceptions to the exclusion of the proffered testimony are overruled.

## IV.

The protestants assign as error the action of the Commission in permitting Vepco to withdraw Schedule No. 18 which was filed in 1936 and which had been in effect until the order in the present proceeding was signed. This is the schedule under which most of the protestants had been purchasing electric energy and which contained no fuel clause. These protestants have no vested right in a schedule approved by the Commission. Whether a utility will be permitted to withdraw an existing schedule of rates is a matter for the determination of the Commission. Once the Commission determined and held that Vepco was entitled to the increase requested, it was then incumbent upon the Commission to approve schedules that in its opinion would be fair and equitable as between the established classifications of customers to be served. It clearly appears from the evidence in the hearing before the Commission that it would be unfair and an unwarranted discrimination to require Vepco to continue to serve some of these protesting municipalities under the old Schedule No. 18, which contained no fuel clause, and to require the other municipalities to acquire their electric needs under a schedule that is based on the present-day cost of generating electricity. This assignment of error is overruled.

## V.

This assignment of error is directed to the action of the Commission in approving Rider G and including such approval in its order, when such rider was approved by the Commission after the formal hearing and without notice to counsel for the protesting municipalities.

It appears that during the hearing, one or more members of the Commission inquired of one of Vepco's witnesses as to how a municipality

could furnish energy to an industrial user should the municipality acquire one that was entitled to purchase electricity under Schedule No. 11. The witness said that he would have to confer with the officials of the company. Thereafter, on 6 March, 1954, a member of Vepco's counsel wrote the Chairman of the Commission and suggested that the question raised in the hearing as to the possibility of a municipality being able to purchase from the company for resale to a large industrial customer, which, if it purchased it from the company, would be entitled to receive service under the proposed Schedule No. 11, might be disposed of by including in the order of the Commission a provision like the following: "Provided, however, that if any customer which, if it purchased energy from the Company, would be entitled to service under Schedule No. 11 as hereby approved hereafter desires to purchase energy from any municipality to which the Company sells energy at wholesale for resale, the Company shall file with the Commission a new rate schedule which will provide that the Company will sell to such municipality, at a delivery point to be designated by the municipality, the energy which it resells to each such customer pursuant to rates not in excess of the rates at the time in effect under the Company's Schedule No. 11."

The Commission, after receipt of the above letter, requested a conference with representatives of Vepco. This conference, according to the record, was held on 9 March, 1954, and related only to the single question as to whether Schedule No. 11 would be made available to any municipality which might obtain a large industry that would be eligible for service under the schedule. As a result of the conference, Rider G was approved and included in the order of the Commission. This rider provides that if any industrial customer locates within any municipality purchasing power from Vepco for resale, and if such customer would be entitled to receive service from Vepco under its rate Schedule No. 11, the company will construct all necessary facilities (up to the delivery point selected by the municipality) to serve such customer, including transforming substations if needed. In addition thereto, it is provided that Vepco will meter the municipality separately for its purchases for normal resale purposes, and under Schedule No. 11 or its equivalent, for resale to its industrial customers. The rider further provides that the municipality will be free to serve such customers under any rate it may desire to put into effect.

The statute with respect to hearings before the Commission, G.S. 62-23, reads as follows: "All hearings before the Commission or its examiners shall be public, and shall be conducted in accordance with such general rules and regulations as the Commission may prescribe. A full and complete record shall be kept of all proceedings had before

the Commission or its examiners, on any formal hearing, and all testimony shall be taken by a reporter appointed by the Commission. . . ."

At the informal conference about which the protestants now complain, it is not contended that the testimony of any witness was taken. No record of what was said in the conference was made.

The protestants devote a substantial part of their brief in an attempt to show that the order of the Commission should be reversed on account of this conference. Numerous cases are cited; however, in our opinion all of them are distinguishable and not controlling on the facts disclosed on the present record. It is not contended that the rates in any of the proposed schedules were changed in any respect as a result of this conference.

We concede that it was unfortunate that counsel for the protestants were not notified of the requested conference and its purpose, thereby giving them an opportunity to be present if they so desired. Unquestionably, this was an unintentional oversight. Even so, we do not construe the evidence as to what took place at the conference to constitute a formal hearing within the meaning of G.S. 62-23, or that what was done invalidates the order of the Commission with respect thereto. In the case of *Louisville N. R. Co. v. Sloss-Sheffield Co.*, 269 U.S. 217, 70 L. Ed. 242, the identical question now before us was considered. *Justice Brandeis*, speaking for the Court, said: "The Commission, like a court, may, upon its own motion or upon request, correct any order still under its control without notice to a party who cannot possibly suffer by the modification made."

At the time of the consideration of the protestants' petition to rehear this matter, counsel for the protestants vigorously condemned the Commission for what it had done and insisted that the rights of the protestants had been prejudiced thereby. Whereupon, Vepco offered to withdraw Rider G, and counsel for the protesting municipalities refused the offer. The Chairman of the Commission then inquired of counsel for the protestants as to whether he would rather have the rider left in the order or taken out, and counsel replied: "I don't think it matters—I think it is a matter the Commission has the privilege of putting in and we don't think it will benefit us, but we are not going to say whether we want it in or not."

In our opinion, no prejudicial error has been shown under this assignment of error. Any municipality served under Vepco's Schedules Nos. 9 or 10, if it gets a large industrial user which is eligible to purchase electricity under Schedule No. 11, may buy the electric energy for such industry or it may let the industry be served direct by Vepco. Furthermore, under Rider G, if the municipality elects to purchase the power it will be free to make its own contract with the industrial user as to

what price it will pay the municipality for such power.  No municipality will be bound to take any current under Rider G.  It is purely an optional arrangement, worked out and adopted as a result of inquiries made by one or more members of the Commission during the hearing, and is clearly intended to be a concession to the protestants.

It is regrettable that a controversy of this character should have arisen in this important proceeding.  However, when counsel for the protestants refused to consent to the withdrawal of the rider complained of when counsel for Vepco consented that it might be withdrawn, and further refused to tell the Commission whether the protestants wanted the rider left in or taken out of the order, the protestants have no ground for complaint because it was retained.

## VI.

The protestants insist that Rider G purports to fix the rate at which the municipality would be required to sell electricity to an industrial customer, in violation of G.S. 62-30 (3).  The rider contains no such provision, but, on the contrary, expressly states that the municipality shall be free to contract with respect to the price it will require its industrial customer to pay when the electric energy is purchased pursuant to the terms of the rider.

## VII.

It is contended that the Commission was in error when it received evidence as to profits realized by the protesting municipal corporations from the resale of electricity purchased from Vepco.

We think this evidence has been made competent by statute.  G.S. 62-18 reads in pertinent part as follows: "All evidence, including records and documents in the possession of the Commission of which it desires to avail itself, shall be made a part of the record in the case by definite reference thereto at the hearing."  G.S. 62-98 provides, "Every municipality engaged in operating any works or systems for the manufacture and supplying of gas or electricity, or purchasing same for distribution and resale, . . . shall make an annual report to the Commission, verified by the oath of the general manager or superintendent thereof, on the same blanks as now provided for reports of privately owned utilities, giving the same information as required of such utilities."

The evidence offered by Vepco with respect to the profits of several of the protesting municipalities, realized from the resale of electricity purchased from Vepco, consisted of copies of the annual reports of these municipalities filed with the Commission pursuant to the requirements

of G.S. 62-98. They were offered in evidence as exhibits and made a part of the record as authorized by G.S. 62-18.

It is true this evidence could have no bearing on whether or not Vepco should have the increase it requested. But, on the question as to whether the proposed schedules were fair and equitable as between groups or classifications to be served under such schedules, we think these reports were properly admitted. For example, Exhibit No. 48 in the hearing before the Commission is the annual report of the Town of Edenton filed with the Commission for the year ending 30 June, 1952. This report shows that Edenton for that year purchased from Vepco 6,478,000 kwh for $71,760.67. According to this report, the Town of Edenton used 470,776 kwh for lighting its streets and other municipal purposes, and resold the remainder of the electricity to its customers for a gross amount of $173,512.52. The operating and distributing costs are not given in the report. Exhibit No. 53 is the annual report of Elizabeth City for the year ending 30 June, 1952, and shows that the City purchased from Vepco 28,267,200 kwh for $305,912.97; it used for municipal purposes 1,433,250 kwh and resold the remainder to its customers for the gross amount of $621,529.00. After deducting operating expenses and paying $18,294.00 on long-term indebtedness, it had a net profit of $192,502.75. Likewise, Exhibit No. 57 is the annual report of the Town of Hertford for the year ending 30 June, 1952, and shows that the Town purchased 2,630,400 kwh from Vepco for $28,409.80. It used for municipal purposes 255,250 kwh and resold the remainder to its customers for $77,305.81. After deducting operating expenses and paying $3,408.59 interest on long-term indebtedness and $5,000.00 on debt retirement, the Town had a net profit of $20,466.52.

It appears from the evidence that under Schedules Nos. 9 and 10, now in effect, Elizabeth City will receive a small reduction in its rates amounting to $1,258.50 per year, while the other seven protesting municipalities will have a total increase of $23,482.00 per year. It is apparent from the evidence that this increase is largely due to the fact that all of these protesting municipalities except Edenton, which will have an increase of only $700.00 per year, have been purchasing their electric energy from Vepco under Schedule No. 18, filed in 1936, which had no fuel clause. Under Schedule No. 11, Halifax Paper Corporation will get a decrease of approximately $42,000.00 annually. However, that corporation, like Elizabeth City, had been purchasing electric energy from Vepco under a contract that contained a fuel clause.

The statutes, G.S. 62-26.10 and 62-123, make the rates fixed by the Commission not only *prima facie* evidence of their validity, but that they are just and reasonable, *Utilities Commission v. Ray, supra; Utilities Commission v. Coach Co., supra,* and we think the pertinent

findings by the Commission are supported by competent, material and substantial evidence. Therefore, it is our conclusion and we hold that the evidence discloses a substantial difference in the condition of the groups to be served under the respective schedules approved by the Commission. We further hold that no discrimination has been shown to exist as between the groups served under the respective classifications that would justify this Court in reversing the court below.

The judgment of the court below is

Affirmed.