OF

# NORTH CAROLINA

AT

## RALEIGH

## SPRING TERM, 1962

STATE OF NORTH CAROLINA, ex rel. UTILITIES COMMISSION v. SOUTHERN RAILWAY COMPANY and CAROLINA & NORTHWESTERN RAILWAY COMPANY.

(Filed 28 February, 1962.)

**1. Carriers § 7—**

A carrier is required to provide equality of rights and facilities for shippers of goods who request service under substantially similar circumstances and conditions, and exigencies of competition do not justify discrimination between shippers.

**2. Same; Utilities Commission § 3—**

It is unlawful for a carrier to refuse to provide reciprocal switching facilities between private or assigned sidings of shippers on the lines of such carrier and the terminal interchange tracks jointly owned with competing carriers when such refusal is predicated upon the percentage of a shipper's freight which is transported by competing line-haul carriers, and an order of the Utilities Commission requiring such carrier to furnish switching facilities to all shippers similarly situated, the cost of the switching operations to be absorbed by the line-haul carrier, is a lawful exercise of authority by the Commission.

**3. Utilities Commission § 9—**

An order of the Utilities Commission is *prima facie* just and reasonable, and where the findings of the Commmission are supported by competent, material, and substantial evidence, an order which the Commission has authority to enter upon such findings will be affirmed.

APPEAL by defendants from *Walker, Special Judge,* 14 September Term 1961 of GUILFORD (High Point Division). This appeal was docketed in the Supreme Court as Case No. 596 and argued at the Fall Term 1961.

This proceeding was commenced by a complaint filed with the North Carolina Utilities Commission (hereinafter called Commission) on 19 October 1959. The complainants are the Chamber of Commerce of High Point, North Carolina, and the following members thereof engaged in business and industrial activities in High Point: Amos Hosiery Mills, Beeson Hardware Company, Carolina Farnsworth, Inc., Casard Furniture Manufacturing Corp., W. A. Davis Milling Company, High Point Hardware Company, High Point Paper Box Company, Inc., General Steel Products, Inc., Heritage Furniture Company, Logan Porter Mirror Company, Marsden-Slate, Inc., National Food Stores, Inc., Silver Knit Hosiery Mills, Slane Hosiery Mills, Inc., Snow Lumber Company, Inc., and Westwood Lumber Company.

The defendants named in the complaint are the Southern Railway Company (hereinafter referred to as Southern) and its subsidiary, the Carolina & Northwestern Railway (hereinafter referred to as C&NW), and the High Point, Thomasville & Denton Railroad Company (hereinafter referred to as HPT&D), and several connecting lines which participate with the HPT&D in competitive through routes and joint rates to and from High Point.

The complainants seek relief for themselves and their local industries from certain allegedly illegal practices of the defendants in refusing to grant reciprocal switching to all industries within the switching limits of High Point. Reciprocal or connection-terminal switching is called for where the line-haul carrier is one other than the carrier which serves the industry shipping or receiving the freight. In such a case, where reciprocal switching exists, the carrier serving that industry will switch cars from the industrial siding to the tracks of the line-haul carrier, or, in the case of inbound traffic, from the exchange tracks of the line-haul carrier to the private or assigned siding of the consignee. The switching charge is absorbed by the line-haul carrier in order that its rates will be competitive with those of the carrier serving the industry.

The practices complained of, insofar as they relate to intrastate traffic, are subject to the jurisdiction of the Commission.

The complainants allege that for many years it was the established practice of these three defendants to absorb the reciprocal switching charges for some 91 industries in the High Point switching area. It is further alleged that such practice constituted and constitutes a just and reasonable practice and the maintenance of open through com-

petitive routes and joint rates to and from High Point, and that the maintenance of such practice is in the public interest.

The Southern publishes a switching and absorption tariff governing switching and transfer, and provides for absorption of switching and transfer charges, at points named in the tariff, including a list of industries which are open to reciprocal switching. The C&NW participates in the Southern's absorption tariff, while HPT&D publishes its own switching and absorption tariff. Of 106 industries and business establishments located on the Southern and C&NW in the High Point switching area, approximately 40 are listed by the Southern as open to reciprocal switching, and ten are listed as open to reciprocal switching when the lowest rates do not apply over the Southern. Of 73 industries or business establishments located on the HPT&D, approximately 44 are open to reciprocal switching. Of the complainant industries and business establishments, all but one, General Steel Products, Inc., are located on the Southern or C&NW. All of the 15 complainants located on the Southern or the C&NW have been removed from the reciprocal switching tariff of the Southern after they or their predecessor in ownership had been listed for a long period of years, and the Southern has refused to list, relist, or include them in its reciprocal switching tariff, and the complainants allege that this is an unjust and unreasonable practice and results in the collection of unjust and unreasonable charges in addition to the High Point rates.

It is further alleged that Southern's absorption tariff is unduly and unreasonably complex; that it contains many confusing details and specific provisions; that it fails to state the charges plainly, contains copious, complex and confusing exceptions, limitations and restrictions, which result in the assessment of unwarranted charges in addition to the High Point long-haul rate.

The complainants pray that the defendants be required to furnish a simple tariff providing for the absorption of reciprocal switching charges on all present and future industrial services by private or assigned sidings in the established switching area in High Point.

The HPT&D filed answer admitting all material allegations of the complaint and declaring that it was ready to join the railroads serving High Point in publishing a joint reciprocal switching tariff including all industries which had private or assigned sidings. The Southern and the C&NW answered denying any violation of any statute of North Carolina. The C&NW is a wholly owned subsidiary of the Southern and joined it in the publication of Southern's switching tariff and is governed thereby with respect to reciprocal switching.

The Interstate Commmerce Commission held a hearing in High Point on the complaint filed with it. It was stipulated by the parties

that the record made at that hearing be introduced into evidence at the hearing held before the Commission. This was done, and further evidence was also taken at the hearing before the Commission. The Commission issued an order based upon the following findings of fact and conclusions:

## "FINDINGS OF FACT

"1. Defendants Southern Railway Company, Carolina & Northwestern Railway Company, and High Point, Thomasville & Denton Railroad Company are common carriers by railroad engaged in the transportation of property between High Point and points in North Carolina subject to the jurisdiction of this Commission.

"2. Carolina & Northwestern Railway Company is a subsidiary of Southern Railway Company and the facilities, terminals, and tracks of these two railroads are operated jointly for the account of both in serving firms located on these lines in High Point.

"3. Defendants in certain instances accord reciprocal switching but in other instances fail to do so.

"4. Failure of defendants to list in their switching tariffs the names of all industries owning and maintaining private sidings in the conduct of their business and failure to accord reciprocal switching to such industries result in an unreasonable practice.

"5. Failure of defendants to list in their switching tariffs the names of all industries which have been assigned sidings for their exclusive use and failure to accord reciprocal switching to such industries result in an unreasonable practice.

"6. The practice of providing reciprocal switching for certain industries and denying such to others under substantially similar circumstances and conditions is unduly preferential of those accorded reciprocal switching and unduly prejudicial to those not accorded reciprocal switching.

"7. Refusal of defendants to provide reciprocal switching and absorption of switching charges on traffic to or from industries or firms utilizing facilities or tracks owned and maintained by defendants other than those assigned is not an unreasonable practice.

"8. Section 3 of Defendant Southern's Switching Tariff No. 16 which prohibits reciprocal switching to or from private tracks of industries or firms that undergo change in type of business is unjust and unreasonable.

"9. Assessment of line-haul rates to or from High Point plus switching charges on non-competitive traffic in excess of charges based on lawful line-haul rates to or from the next more distant point is in violation of G.S. 62-128, and therefore unlawful.

"10. Orders in Dockets No. R-29, Sub 82, and R-29, Sub 84, investigations of reciprocal switching at High Point for account of Amos Hosiery Mills, Inc., High Point Paper Box Company, Inc., Silver Knit Hosiery Mills, Inc., Slane Hosiery Mills, Inc., and W. A. Davis Milling Company are vacated and set aside."

The conclusions in pertinent part read as follows:

"The complaint in this proceeding, having been filed by the High Point Chamber of Commerce and 16 industries or firms in High Point, 15 of which are located on Southern and its subsidiary C&NW and one on HPT&D, was filed also with Interstate Commerce Commission. The complainants seek the same relief from this Commission and the Interstate Commerce Commission. Most of the evidence related to carload traffic moving in interstate commerce. Only a small percentage of traffic to or from High Point originates or terminates at points in North Carolina. Complainants and defendants agree that the same rule governing reciprocal switching and the absorption of switching charges should apply on both interstate and intrastate traffic; otherwise, it is not a good rule.

"Several of the complainants (seven according to the record) are already accorded reciprocal switching on intrastate traffic by reason of two previous investigations by the Commission in Dockets No. R-29, Sub 82, and No. R-29, Sub 84. When orders in these two proceedings were issued, defendant Southern decided to take no further action inasmuch as there were no intrastate movements of any consequence.

"There is evidence that the 15 complainants on Southern (and C&NW) have private or assigned sidings but that most of these industries were cancelled from the switching tariff because, according to Southern, such industries are served by tracks owned by Southern. It is clear from the record that Southern loses considerable revenue by reason of according reciprocal switching to the complainants; thus, the HPT&D receives the line-haul or revenue-haul leaving Southern with only switch-movements producing $13.71 a car; that if Southern received 80 to 85 per cent of the cars moving to or from complainants, reciprocal switching would not be cancelled; and that it decided to cancel reciprocal switching to those complainants who are shipping or receiving their cars via or over competing routes.

"The record might well suggest the following questions:

"1. Should industries or firms having private sidings which are maintained by them be accorded reciprocal switching?

"2. Should industries or firms that have tracks assigned them by defendants be accorded reciprocal switching?

"3. Should industries or firms served by tracks other than assigned

tracks that were constructed and are maintained by defendants be accorded reciprocal switching?

"4. Would denial of reciprocal switching to a firm served by tracks owned and maintained by defendants and the granting of reciprocal switching to a firm having a private track constructed and maintained by it in the same area be prejudicial to the former and preferential of the latter?

"5. If conditions concerning the switching of cars to a private track of one firm are the same as the conditions concerning the switching of cars to another firm located on the same industrial track or in the same area, would the refusal of defendants to accord reciprocal switching to one and not the other create undue preference and prejudice?

"6. Would the routing of 80 to 85 per cent of the cars over the lines of the defendant on which the firms are located and the remaining over a competing line through reciprocal switching justify continued reciprocal switching without other considerations or, stated differently, would the routing of more than 15 to 20 percent of such cars over competing lines justify cancellation of reciprocal switching for that reason alone?

"7. Should a privately owned and maintained track be refused reciprocal switching because such track was transferred or conveyed to another industry or firm which did not engage in the same type of business for which the track had been used even though the transferee or new firm would continue to own and maintain the track?

"8. If so, what would be the criterion that would change the status of such a private track?

"9. In the absence of a change in conditions of switching a private track that has changed ownership and type of business or in which no different service is performed, are defendants justified in refusing to switch cars for the successor firm?

"10. If defendants are permitted to cancel reciprocal switching to or from privately owned tracks as well as to defendant-owned tracks, thereby denying all industries reciprocal switching, would such localize all traffic and thus eliminate competition between rail carriers?

"We believe the record amply supports an affirmative answer to questions 1, 2, 5 and 10 and a negative answer to questions 3, 4, 7 and 9. We believe in answer to question 6 that if a track is classified as being switchable for 80 to 85 per cent of the business routed over the lines of the carrier on which the track is located, it is switchable for any amount. The amount of business given a carrier alone does not determine whether or not reciprocal switching should be accorded or denied.

"It is not in the public interest to deprive firms that have con-

structed tracks on their property at competitive points and are main-
taining them at their own expense of the right to select the carrier in
the transportation of their products. Conversely, it is unreasonable
to require the defendants to accord switching or to open routes via their
competitors in the transportation of traffic for account of firms that
have elected to use carrier-owned and maintained facilities, except
those assigned, rather than to provide and maintain their own proper-
ties. Defendants cannot be expected to invest in facilities without suf-
ficient income to warrant such investment.

"We believe the foregoing is not in contravention of the decision of
the Interstate Commerce Commission in *Minn. R.R. & Warehouse
Com. v. C.G.W. Ry.*, 262 ICC 437, 438, reading:

" 'Right of complainant to prevail in a prayer that carriers be re-
quired to establish reciprocal arrangements turns in part upon whether
the track upon which the industries are located is a private industry
track or a team track. If a team track, which is a carrier's private
terminal, maintained by the carrier at its own expense to accommodate
patrons of its line-haul service, complainant cannot prevail.'

"In Dockets No. R-29, Sub 82, and No. R-29, Sub 84, Suspension
and Investigation of Cancellation by Southern Railway of Switching
Arrangements at High Point, wherein Southern undertook to cancel
and eliminate reciprocal switching provisions at that point for the
firms of Amos Hosiery Mills, Inc., High Point Paper Box Company,
Inc., Silver Knit Hosiery Mills, Inc., Slane Hosiery Mills, Inc., and
W. A. Davis Milling Company, this Commission refused to permit
abandonment of public service which has been so beneficial for so long
a time and that considering the record in those proceedings Southern
was required to continue switching privileges for such concerns. The
current investigation does not change or reverse the decisions in the
two foregoing investigations if the tracks of these firms are not carrier-
owned and maintained tracks. If, however, such tracks, or any of
them, are carrier-owned and maintained (other than assigned tracks)
the orders in Dockets R-29, Sub 82, and No. R-29, Sub 84, are reversed.
In view of the findings herein, the orders in Dockets No. R-29, Sub
82, and No. R-29, Sub 84, are being vacated and set aside.

"Where tariffs of defendants accord reciprocal switching to firms
located on their lines in High Point and the traffic to be switched is
non-competitive and, therefore, subject to payment of the switching
charge by the firm for whose account switching is accorded, the line-
haul rate plus the switching charge should not exceed the through joint
line rate, if any, from or to the next more distant point. The assess-
ment of charges in excess of that applicable on movements not origi-

nating or terminating at High Point but routed through High Point is prima facie unreasonable and not approved in this proceeding.

"We will take no action on the request of complainants that Southern simplify its Switching Tariff and Directory. Perhaps improvements can be made but as all common or competitive points on its lines are included we think this investigation is not the proper place to force wholesale changes, if any need be made, to satisfy the complaints relative to High Point situations.

## *"ORDER*

"IT IS ORDERED, That the defendants Southern Railway Company, Carolina & Northwestern Railway Company and High Point, Thomasville & Denton Railroad Company be, and they are hereby required to provide connection-terminal switching for industries or firms having private or assigned sidings on their lines; that the line-haul carrier absorb the switching charges of the switching carrier on competitive traffic of such industries or firms; that the names of the industries or firms be listed in their switching tariffs, and that the Findings of Fact hereinbefore listed otherwise be conformed with.

"IT IS FURTHER ORDERED, That to the extent other allegations of complainants are not covered by the Findings of Fact hereinbefore listed, the complaint as to such is hereby dismissed and this proceeding is discontinued."

The defendants Southern and its subsidiary C&NW appealed to the Superior Court of Guilford County, and the court entered the following order:

" * * * (T)hat the Report and Order of the North Carolina Utilities Commission dated December 20, 1960, * * * be, and the same is hereby approved and affirmed and declared to be in full force and effect; that each and every exception and assignment of error of the appellants is hereby overruled; that the term 'assigned sidings' as employed in the Commission's findings and Order be, and the same is hereby construed and defined as the actual and normal use which has been made of a railroad track and the attitude of interested parties toward it, rather than some exceptional use in the past or the possibility of a physical change in it for the future; and this proceeding in this Court be dismissed. The appellants are assessed with the costs to be set by the clerk.

"This the 14 day of September, 1961."

The defendants Southern and C&NW appeal, assigning error.

*J. Knox Walker; J. V. Morgan; F. C. Hillyer (of Jacksonville, Florida) for complainant appellees.*
*James V. Lovelace for appellee HPT&D.*
*Joyner, Howison & Mitchell; James A. Bistline (of Washington, D. C.) for appellants Southern and C&NW.*

DENNY, J.   The Interstate Commerce Commission (hereinafter referred to as ICC), on 28 September 1961, found upon the evidence adduced in the hearing before it, which evidence was admitted by agreement in the hearing before the Commission, that the "defendants' refusal to perform switching service at their interchange in High Point, N. C., is, and for the future will be, unjust and unreasonable; and that defendants' practice of performing reciprocal switching for other industries at High Point and not for the complainant industries on competitive traffic, is, and for the future will be, unjustly discriminatory against and unduly prejudicial to the complainants, and unduly preferential of the favored industries * * *."

Based on its findings, the ICC entered the following order: *"It is ordered,* that the defendants named in the complaint, according as they participate in the transportation, be, and they are hereby, notified and required to cease and desist, on or before January 2, 1962, and thereafter to abstain from practicing the unreasonableness, unjust discrimination, and undue prejudice and preference referred to in the preceding paragraph hereof.

*"It is ordered,* that the defendants, according as they participate in the transportation, be, and they are hereby, notified and required to establish, on or before, January 2, 1962, upon notice of this Commission and to the general public by not less than 30 days' filing and posting in the manner prescribed under section 6 of the Interstate Commerce Act, and thereafter to maintain and apply, rates, charges, rules, regulations, and practices which will prevent and avoid the unreasonableness, unjust discrimination, and undue prejudice and preference referred to in the first paragraph hereof."

An order similar to the foregoing order was entered by the ICC in the case of *Seaboard Air Line Rwy. Co. v. United States,* 254 U.S. 57, 65 L. Ed. 129, involving the Seaboard, the Southern and Chesapeake and Ohio Railroads with respect to the absorption of switching charges within the switching limits of Richmond, Virginia. The Court said: " 'Section 2 (of the Act to Regulate Commerce) is primarily directed against discrimination between shippers located in the same community. It is aimed to put all shippers within a switching district upon a substantial equality. It provides that where a carrier receives from any person a greater compensation for any service rendered in the

transportation of passengers or property than it receives from any other person for doing for him a "like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination," — a discrimination which is prohibited and declared to be unlawful. Under this section it is settled that the *competition of rival carriers as such* does not constitute substantially dissimilar circumstances to justify a difference in treatment.'

"We are of the opinion that the Commission was correct in regarding the service in question as a like and contemporary service rendered under substantially similar circumstances and conditions, and amply sustained as matter of law in *Wight v. United States*, 167 U.S. 512, 42 L. Ed. 258, 17 Sup. Ct. Rep. 822, and *Interstate Commerce Commission v. Alabama Midland R. Co.*, 168 U.S. 144, 42 L. Ed. 414, 18 Sup. Ct. Rep. 45. The principle established in these cases is that the statute aims to establish equality of rights among shippers for carriage under substantially similar circumstances and conditions, *and that the exigencies of competition do not justify discrimination against shippers for substantially like services.*" (Emphasis added) See *Pennsylvania Co. v. United States*, 236 U.S. 351, 59 L. Ed. 616, and *Northern P. R. Co. v. United States*, 316 U.S. 346, 86 L. Ed. 1521.

It will be noted that these ICC orders and the decisions upholding them go no further than to compel the offending carrier or carriers to cease and desist from continuing the practice or practices found to be unjust, unreasonable, and discriminatory as between shippers. These orders do not explicitly direct that all shippers be accorded the benefits of reciprocal switching and that the line-haul carrier shall absorb the switching charges, but such orders do make it clear and explicit that shippers similarly situated shall be treated alike.

Therefore, the real question before us is whether or not the court below committed reversible error in affirming the order of the Commission entered in this proceeding on 20 December 1960.

The present situation at High Point with respect to switching practices by the Southern and C&NW is discriminatory as between the fifteen complainants and other industries and business establishments located on the Southern or C&NW which are granted reciprocal switching, and is unjust, unreasonable and, therefore, unlawful.

On one side of this controversy we have the Southern and its wholly owned subsidiary the C&NW, together with other connecting carriers, which makes available to industries in High Point located on the Southern or C&NW a vast system of railways. On the other hand, we have the HPT&D, a locally owned road until recently, which connects with the Winston-Salem Southbound (hereinafter referred to as

WSS) at High Rock, North Carolina. The WSS is jointly owned by the Norfolk & Western Railway Company and the Atlantic Coast Line Railway Company. The WSS has obtained all of the stock of the HPT&D since the institution of this proceeding. The HPT&D with its connection with the WSS, connects with the Norfolk & Western at Winston-Salem, the Norfolk & Southern at Norwood, and the Atlantic Coast Line and Seaboard Air Line Railroads at Wadesboro, which makes available to industries and business establishments located on the HPT&D at High Point or Thomasville these transportation facilities, together with other connecting carriers.

For thirty years or more there was little, if any, difficulty in connection with the switching practices at High Point. Approximately six or eight years ago the Southern decided that too many carloads of freight were being shipped to and from High Point over the HPT&D and its connecting lines — freight that could have been shipped to and from High Point over the Southern at the same cost. Therefore, the Southern began to drop from or refused to list in its reciprocal switching tariff the names of the fifteen complaining industries and business establishments which had private or assigned siding on the Southern or its subsidiary the C&NW.

The status of the fifteen complainants who have been removed from or refused inclusion in the Southern's list which would entitle them to be included in its reciprocal switching tariff, may be illustrated by the following: For example, a carload shipment of lumber is made by a consignor at Wilmington, North Carolina, to Heritage Furniture Company located on the Southern at High Point. The car having originated on the Atlantic Coast Line Railroad, was moved to High Point over the Atlantic Coast Line, the WSS, and the HPT&D, an established through route. On arrival at High Point, the HPT&D tenders the car to the Southern Railway at their jointly owned interchange tracks, a very short distance from the Heritage private industrial track served by the Southern. The Southern *refuses to switch* the car to the Heritage plant. Heritage must accept delivery on an HPT&D team track and dray the lumber to its plant, at extra expense, or have the car shipped by rail through Thomasville, and back over the Southern to High Point, and pay extra line-haul charges.

If, however, Heritage Furniture Company had not been dropped from the list of Southern's reciprocal switching tariff, when the carload of lumber was tendered to the Southern on the interchange track at High Point, the Southern would have promptly placed the car on the private siding of the Heritage Furniture Company, and the HPT&D would have paid the Southern the reciprocal switching charge of $13.71 and would have absorbed such charge.

There is no controversy in this proceeding among the defendants over the reasonableness of the amount of the reciprocal switching charge of $13.71 per car within the High Point switching area.

The evidence on this record reveals the fact that the Southern and other railroads, in former years, obtained agreements from industries and business concerns located on their lines, to the effect that such industries and business concerns would ship all their freight over the line serving them on their private or assigned siding. It is conceded by the Southern that such agreements were and are null and void and under the law could not be enforced. It was further conceded that a shipper has the right to route his traffic. Therefore, it would seem to follow that when a shipper is refused switching service in an effort to force him to ship over the railroad that serves his private or assigned siding, it is an effort to do indirectly what cannot be done legally under a contract directly with the shipper.

We think the evidence in this proceeding supports the conclusion that the removal of the names of the fifteen complainants whose industries or business establishments are located on the Southern or the C&NW from the list of those included in the reciprocal switching tariff, and the refusal to switch cars consigned to these complainants unless the cars are taken to Thomasville and turned over to the Southern there and brought back to High Point over its lines and delivered to the consignee, is the result of a deliberate effort to force the discontinuance of carload shipments to and from High Point over the HPT&D and its affiliates by these complainants.

The evidence is to the effect that the re-routing of a car from High Point to Thomasville and back to High Point over the Southern, costs anywhere from $50.00 to $100.00 per car, depending on the weight, classification, etc.

A member of the Commission propounded to one of the Southern's principal witnesses the following: "You are telling me simply and plainly, it is because you want to make a shipper ship over the Southern without regard to what a shipper wants to do." The witness replied, "In substance, that is what I mean."

There is further evidence tending to show that these complainants were removed from the Southern's reciprocal switching list because the Southern felt that too many cars were being routed to and from these industries and business concerns via the HPT&D and its connecting carriers, when the cars could have been shipped into or from High Point over the Southern at the same cost to the shipper or consignee. The Southern in its explanation of why the complainants were removed from its reciprocal switching tariff, offered testimony to the effect that the HPT&D was owned by local people and, naturally,

they were inclined to favor property in which they had an interest. However, this situation no longer exists, as we have heretofore pointed out.

Further, in the instant proceeding, the Southern in discussing the question as to what it considered its fair share of the line-haul, the witness said: "A fair share is pretty difficult to define. As a rule of thumb, we have not disturbed anyone, generally speaking, where we got as much as 80 to 85 percent of their cars."

In *Northern P. R. Co. v. United States, supra,* it is said: "It was further found that the carriers' absorption practices at the complaining markets were supported neither by revenue considerations nor sound transportation factors, and that the widespread absorption of switching charges on noncompetitive traffic at other important markets *was strong evidence* of the reasonableness of such practice and of the unreasonableness of the carriers' refusal to absorb such charges at the complaining markets. * * *" (Emphasis added).

The Commission's order in this proceeding apparently requires the defendants to do no more than they did voluntarily and without objection for thirty years or more, preceding the last six or eight years. This would seem to be "strong evidence" of the reasonableness of the practice to which they adhered for so many years.

It is provided in G.S. 62-26.10: " * * * Upon any appeal to the superior court, the rates fixed, or any rule, regulation, finding, determination, or order made by the Commission under the provisions of this Chapter (Chapter 62, Utilities Commission), shall be prima facie just and reasonable. * * *" *Utilities Commission v. Ray,* 236 N.C. 692, 73 S.E. 2d 870; *Utilities Commission v. Municipal Corporations,* 243 N.C. 193, 90 S.E. 2d 519; *Utilities Commission v. Casey,* 245 N.C. 297, 96 S.E. 2d 8.

As a practical matter, it is difficult to comprehend how the industries and business concerns in High Point may be benefited to any appreciable extent by having competing railroads rather than a single road, unless there is some practical and enforceable arrangement whereby carload shipments going into or out of High Point may be switched to or from industries and business concerns located on private or assigned sidings served by a railroad other than the line-haul carrier.

In our opinion, the findings of the Commission are supported by competent, material and substantial evidence, and the Commission is vested with the authority to enter the challenged order. General Statutes of North Carolina, Ch. 62, Sections 27, 28, 30, 39, 55, 70, 74, 75, 122, 128, 137 and 143. Therefore the order of the court below affirming the order of the Commission entered on 20 December 1960, is

Affirmed.