NORTH CAROLINA ELECTRIC MEMBERSHIP CORPORATION; Haywood Electric Membership Corporation; Pitt & Greene Electric Membership Corporation; Four County Electric Membership Corporation; Piedmont Electric Membership Corporation; Halifax Electric Membership Corporation; Randolph Electric Membership Corporation; Harkers Island Electric Membership Corporation; Brunswick Electric Membership Corporation; Jones–Onslow Electric Membership Corporation; French Broad Electric Membership Corporation; Wake Electric Membership Corporation; Tri–County Electric Membership Corporation; Lumbee River Electric Membership Corporation; South River Electric Membership Corporation; Carteret–Craven Electric Membership Corporation; and Central Electric Membership Corporation, Plaintiffs,

v.

CAROLINA POWER & LIGHT COMPANY, Defendant.

Civ. No. C–77–396–G.

United States District Court,
M.D. North Carolina,
Greensboro Division.

Oct. 24, 1991.

See also 108 F.R.D. 283, 110 F.R.D. 511.

Thomas J. Bolch, Raleigh, N.C., Kenneth K. Kyre, Edward L. Murrelle, Lindsay R. Davis, Jr., Richard J. Votta, Greensboro, N.C., David A. Leckie, Wallace E. Brand, William S. Morrow, Jr., Sean T. Beeny, Washington, D.C., for plaintiffs.

Richmond G. Bernhardt, Jr., Greensboro, N.C., Linda Daniels, Research Triangle Park, N.C., Charles D. Barham, Jr., H. Ray Starling, Raleigh, N.C., Ray S. Bolze, Kenneth E. Krosin, Wm. Warfield Ross, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BULLOCK, District Judge.

There are seventeen (17) Plaintiffs in this case.[1] Sixteen (16) are electric distribution cooperatives[2] ("EDCs") located mainly in rural areas of North Carolina. The other is the North Carolina Electric Membership Corporation[3] ("NCEMC"), a cooperative formed by the Plaintiff EDCs[4]—as well as other EDCs not themselves plaintiffs in this case. NCEMC's main function is to develop a viable generation and transmission ("G & T") system to make its EDC members independent of the large utilities' wholesale power supply so that they can compete more effectively against those utilities in the retail power distribution market. The Defendant is Carolina Power & Light Company ("CP & L"), a large electric utility that provides retail and wholesale power to most of eastern North Carolina. CP & L has been the principal supplier of wholesale power to the Plaintiff EDCs.

This antitrust dispute centers on alleged anticompetitive conduct which perpetuated CP & L's monopoly control of the electric G & T business[5] at the Plaintiffs' expense. The matter is before the court upon several motions of CP & L for summary judgment pursuant to Fed.R.Civ.P. 56. CP & L's motions allege that (1) the Plaintiffs' claims are barred by the statute of limitations; (2) the Plaintiffs' evidence is insufficient as a matter of law to support any plausible antitrust theory; (3) the Plaintiffs lack standing to pursue their claims; and (4) the Plaintiffs' claims are barred by various doctrines of antitrust immunity.

The Plaintiffs contend that CP & L has prevented NCEMC from building a G & T system, which would have supplied the EDCs with wholesale power, by restricting NCEMC's access to power exchange services[6] and by preventing NCEMC from obtaining the capital necessary to finance a G & T system. As a result, the EDCs remain

1. This complex case was stayed for several years at the request of the parties while they explored various ways to settle this litigation.

2. EDCs are electric utility distribution systems owned by cooperative corporations engaged in the distribution of power to retail customers. Some EDCs own small electric generating facilities and transmission lines. Others own no generation or transmission facilities and receive all of their power supply from purchases at wholesale.

3. NCEMC is a cooperative corporation organized under the laws of North Carolina for the purpose of carrying out the wholesale power supply ventures of the EDCs in North Carolina. These functions include acting as a bargaining agent for the EDCs in negotiations with other utilities concerning wholesale power purchases and conducting studies to determine whether it can feasibly construct an electric generation and transmission system which would satisfy the wholesale power needs of the EDCs.

NCEMC and its predecessor organization has been in existence since 1949.

4. All the Plaintiff EDCs are members of NCEMC except for French Broad EDC.

5. By January 1, 1976, twenty (20) months before the Plaintiffs filed their complaint, CP & L controlled over eighty-five per cent (85%) of the generating capacity in eastern North Carolina and over eighty-five per cent (85%) of the transmission lines in eastern North Carolina.

6. Power exchange services are the various types of services available from coordinating utilities necessary to develop a G & T system. Such services include emergency or maintenance power and energy under a plan of reserve sharing, power and energy from a specific unit under a plan of coordinated development, short-term or limited term power used to satisfy needs resulting from a long-term deficiency in capacity, wheeling services, opportunities for investment in joint generation or transmission

captive electricity customers of CP & L,[7] NCEMC has not developed an alternative wholesale power supply source, and NCEMC has not entered the G & T business. The Plaintiffs allege that to accomplish this CP & L conspired to restrain trade in violation of Section 1 of the Sherman Act[8] and monopolized the G & T business in violation of Section 2 of the Sherman Act[9] through price-fixing, predatory pricing, and refusing to deal in good faith. The Plaintiffs have sued for an injunction requiring CP & L to coordinate G & T operations and planning with NCEMC and for damages of two types. They demand (1) financing by CP & L of a G & T system less the depreciated value of such a system had it been built in the 1950's—so-called Type I damages and a proxy for all the Plaintiffs' future damages; and (2) the difference between what the EDCs paid CP & L for power and the cost of power from a hypothetical G & T plant which allegedly would have been built absent CP & L's bad conduct—so-called Type II damages and a proxy for all the Plaintiffs' past damages.

## FACTS

Some of the facts in this case are disputed, but none that are material for determination of these motions. The Plaintiffs allege that for more than five decades CP & L prevented NCEMC from building a G & T system, thereby forcing the rural EDCs to remain dependent upon CP & L for power. Without such a system, NCEMC could not compete for G & T business in eastern North Carolina. CP & L denies that it excluded NCEMC from the G

---

facilities, and energy incident to a planned hydro-thermal coordination.

7. The parties cannot agree on whether the sixteen EDCs are suing as potential excluded competitors from the G & T business or as captive customers of CP & L. Much of the confusion stems from conflicting representations made in the Plaintiffs' responses to CP & L's summary judgment motions. *Compare* Plaintiffs' Response Opposing Untimely Motion for Partial Summary Judgment on Grounds of Standing, at 2–4 (Apr. 7, 1986) (asserting that the sixteen EDCs are suing as customers in a market in which trade has been restrained) *with* Plaintiffs' Response Opposing Summary Judgment on Grounds of Claimed Immunity from the Antitrust Laws, at 78, 85 (Mar. 12, 1986) (asserting that all the Plaintiffs are suing as potential competitors in the G & T business, as well as customers of CP & L, and that all of the Plaintiffs' damages stem from their potential capacity as competitors). Furthermore, it is unclear from the papers of the parties whether NCEMC is anything more than an extension of the Plaintiff EDCs or whether it is an independent corporation. What is clear is that, regardless of whether the sixteen EDCs are suing as customers or potential competitors of CP & L, their rights are no greater and no less than NCEMC's because all the damage in this case comes from the alleged exclusion of NCEMC from the G & T business. As the Plaintiffs concisely put it, "[w]hat this case is really about ... is the Defendant's continuing frustration of the efforts of Plaintiff NCEMC to enter the generation and transmission business." Plaintiffs' Response Opposing Defendant's Motion for Summary Judgment under the Statute of Limitations, at 5–6 (Jan. 14, 1986). With that in mind, the court will examine the Plaintiffs' claims from the perspective that the fortunes of the sixteen EDCs will rise or fall with those of NCEMC. It is undisputed that NCEMC is suing as a potential, but so far excluded, competitor of CP & L in the G & T business.

8. Section 1 of the Sherman Act provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1 (1988). In order to prevail on its Section 1 claim, the Plaintiffs must prove that CP & L's concerted action with other utilities was an unreasonable restraint of trade. *See Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In so doing, the plaintiff must show "(1) that the conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market; (2) that the objects of and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy." *Terry's Floor Fashions v. Burlington Indus.*, 763 F.2d 604, 610 n. 10 (4th Cir.1985) (citation omitted).

9. Section 2 of the Sherman Act provides in pertinent part that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2 (1988). To prevail on a monopolization claim a plaintiff must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and antitrust injury. *See United States v. Grinnell Corp.*, 384

& T business and contends that it did not violate the antitrust laws.

The Plaintiffs' story begins in 1935 with the formation of the Rural Electrification Administration[10] ("REA"). Aided by the federal government, EDCs began to develop throughout rural North Carolina. In the 1930's, allegedly feeling threatened by these potential competitors in the retail market, CP & L supposedly tried to halt their growth by refusing to wheel power[11] to them, by lobbying against Santee–Cooper[12] and, once those efforts failed, by offering to buy the full output from Santee–Cooper, and by setting dual rates with the rural EDCs getting significantly lower rates than CP & L's other customers. CP & L allegedly took these steps not only to prevent competition in the G & T business but also to keep the EDCs dependent upon CP & L for electricity, thereby gaining an advantage in their competition with the EDCs in the retail market.

In 1944, to hasten the pace of rural electrification, the REA made loans available at two per cent (2%) interest to help rural EDCs obtain a dependable source of electricity. Allegedly to prevent the rural EDCs in North Carolina from getting these two per cent (2%) loans and building a G & T system, CP & L—along with Tide Water Power Company and Virginia Electric & Power Company—lowered its rates to the

EDCs. In 1945, CP & L lowered its rates from between 12.0–15.0 mills per kwh to 7.5 mills per kwh.[13] This rate continued until 1971.

The parties differ about the rate-making motivations of CP & L. CP & L contends it lowered rates due to pressure from Congress to electrify the countryside. The rate remained constant for twenty-six (26) years because CP & L's cost of supplying power steadily decreased during this time. The Plaintiffs counter that CP & L offered these rates for the aforementioned anticompetitive reasons. CP & L's low rates allegedly ensured that the Plaintiff EDCs could not qualify for REA two per cent (2%) loan money since the REA would not make loans to EDCs which had a cheap, dependable source of power.[14] CP & L allegedly further frustrated the efforts of the EDCs to obtain an alternative source of wholesale power by withholding power exchange services from them.

The Plaintiffs argue that the 7.5 mills per kwh rate CP & L charged the Plaintiff EDCs was below-cost. The Plaintiffs' expert, Harold H. Wein, is of the opinion that this rate was below CP & L's reasonably anticipated long-run incremental cost[15] of power supply. According to Wein, CP & L could afford this loss due to cross-subsidization from the excess profits obtained from its other customers.[16]

U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966).

10. The REA was created by Congress to aid efforts to fully electrify rural areas of the country.

11. Wheeling power is an arrangement in which one utility uses the surplus transmission facilities of another utility to obtain electricity from a source not directly connected to the system of the former.

12. Santee–Cooper was a hydroelectric generating unit developed to provide power to rural EDCs. It was built by the South Carolina Public Service Authority and began producing electricity in 1942.

13. A "mill" is one-tenth ($\frac{1}{10}$) of a cent; "kw" is shorthand for kilowatt, a measure of power or electrical capacity available to a user; and "kwh" is shorthand for kilowatt-hour, a measure of energy supplied to the user.

14. The main goal of the REA was to electrify rural areas, not to enable small EDCs to compete for G & T business. Consistent with its mission, the REA would never approve a loan to build a G & T system that would produce more expensive power than an EDC could obtain from a large utility.

15. Long-run incremental cost "measures *all* the costs of adding a new product or service—'fixed' as well as variable costs (and 'capital' as well as 'operating' items). Essentially, the LRIC approach assumes that *all* costs become variable in the long run." *MCI Communications Corp. v. AT & T Co.*, 708 F.2d 1081, 1115 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (footnote omitted).

16. Wein argues that market factors in the utility industry such as high barriers to entry due to huge capital costs and inefficient state and federal regulation made a predatory scheme by CP & L plausible.

The parties strongly disagree about the reliability of the sources Wein considered in determining CP & L was losing money on the 7.5 mills per kwh rate it charged the EDCs from 1945–71. According to the Plaintiffs, Wein relied on credible sources of evidence including CP & L's admissions, data submitted to regulatory agencies, CP & L's confirmed losses to other large industrial customers, the rising cost of equipment and material, CP & L's lack of excess capacity, and an analysis that estimated the cost of power in 1949–50 from CP & L's Lumberton Power Plant.[17] CP & L views Wein's cost calculations as misleading and argues that it never sold power to the rural EDCs below cost. CP & L argues that Wein did not complete a formal study of the reasonably anticipated long-run incremental costs of supplying power to the EDCs and that most of Wein's figures are the product of speculative assumptions rather than actual cost records from the files of CP & L.

Along with cost evidence, the Plaintiffs present direct and circumstantial evidence that CP & L was pricing below cost. The Plaintiffs' direct evidence consists of a few statements by CP & L executives indicating that the 7.5 mills per kwh rate was a subsidized rate, that CP & L wanted to stifle any potential competition in the G & T business, that CP & L planned to thwart attempts by the EDCs to get REA financing for the construction of a G & T system by lowering their rates, and that CP & L enlisted Tide Water Power Company and Virginia Electric & Power Company in this scheme.

The Plaintiffs' circumstantial evidence indicating that CP & L's 7.5 mills per kwh rate to the EDCs was predatory is more extensive. The Plaintiffs point out that in March 1944 CP & L represented to the REA that it could not reduce its rates to the EDCs because of increasing material, labor, and tax costs; next, CP & L persuaded state regulators that those rates were just and reasonable; one year later, without any substantial reduction in its costs, CP & L decreased its rates to 7.5 mills per kwh. The Plaintiffs also assert that the 7.5 mills per kwh rate could not have been based on cost considerations because it remained unchanged from 1945 to 1971. Furthermore, the Plaintiffs find it no coincidence that Virginia Electric & Power Company and Tide Water Power Company decreased their rates to the EDCs a few years after CP & L did.[18] The Plaintiffs further contend that CP & L subsidized the other utilities for the rates they charged. Finally, once it looked like two per cent (2%) financing from the REA was on the way out, CP & L asked the Federal Power Commission for a thirty-two per cent (32%) rate hike to the EDCs.

Much of the Plaintiffs' circumstantial evidence revolves around alleged anticompetitive activities by CP & L other than the 7.5 mills per kwh rate, such as the withholding of power exchange services. The Plaintiffs contend CP & L opposed any program to help the EDCs lessen their dependence on CP & L for wholesale power. The Plaintiffs cite numerous examples.[19] The Plain-

---

**17.** The Lumberton Power Plant was CP & L's newest and most expensive. The cost of power from this plant was well above the 7.5 mills per kwh rate CP & L charged the rural EDCs for electricity.

**18.** In 1950, Virginia Electric & Power Company decreased its rate to the EDCs to 7.5 mills per kwh and Tide Water Power Company decreased its rate to 8.5 mills per kwh.

**19.** First, they point to CP & L's opposition during the 1950's to the financing and construction of a regional bulk electricity transmission network which would serve the Southeast, be coordinated by the Southeastern Power Administration, and lessen the EDCs' dependence upon CP & L for power. Second, they allege that CP & L

along with other dominant regional utilities formed a Carolinas–Virginia pool ("CARVA") in 1961 as a tool to tighten their monopolistic control over the G & T business. CARVA allowed its members to pool and coordinate their electric resources for greater efficiency. The Plaintiffs argue that CP & L prevented the EDCs from joining CARVA and, thereby, precluded them from obtaining similar advantages. Third, they mention that in 1964 a bill mandating coordination—joint planning arrangements between utilities for the development of transmission to take advantage of economies of scale—was defeated in Congress after heavy lobbying by dominant regional utilities like CP & L. Fourth, they note that CP & L refused to negotiate with them over the joint ownership of G & T

tiffs argue that one common theme emerges—CP & L was willing to go to great lengths to prevent the Plaintiffs from obtaining access to a G & T system. The Plaintiffs allege that this plan continued through the seventies and early eighties.[20] All of the anticompetitive inferences from these facts are disputed by the Defendant.

## DISCUSSION

### I. *Statute of Limitations*

The Plaintiffs filed suit on August 17, 1977. Damages are recoverable under the federal antitrust laws only if suit is "commenced within four years after the cause of action accrued." 15 U.S.C. § 15b (1988). A cause of action accrues "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971).

■ The parties agree that the Plaintiffs' various claims properly allege a continuing violation of the antitrust laws. The Supreme Court in *Zenith* explained how continuing antitrust violations are treated under the statute of limitations:

[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. However, each separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial.

401 U.S. at 338–39, 91 S.Ct. at 806 (citations omitted). A cause of action is not barred by the statute of limitations simply because anticompetitive conduct began outside the statutory period so long as some overt act injuring a plaintiff is committed within the limitations period.[21] Under these circumstances, a plaintiff is entitled to recover damages for post-limitations but not pre-limitations overt acts. The only exceptions to this analysis are if the injury occurs within the limitations period, or if a portion of a plaintiff's future damages are

systems throughout the 1960's even though other large utilities were negotiating in good faith. Fifth, they allege that the purpose of the Southeastern Reliability Council, formed in 1969 by CP & L and South Carolina Electric & Gas Company, was to prevent the rural EDCs from receiving the benefits of regional coordination in the power exchange market. Sixth, they point to CP & L's opposition to the Yankee-Dixie bill in Congress—a proposal to coordinate G & T systems among municipal and rural electric utilities in twenty-one (21) states, including North Carolina.

20. They cite CP & L's refusal in 1976 to help the EDCs obtain power from Georgia Power Company's Vogtle Nuclear Power Plant; CP & L's refusal during 1974 and 1975 to sell the EDCs joint ownership in the Brunswick and Harris Nuclear Power Plants; CP & L's opposition from 1968–74 to Electric Power in the Carolinas—an aborted statewide power project which would have joined all North Carolina municipalities owning electric systems with the EDCs; CP & L's rate increases from 1971 to the present and the pancaking of new rate increases on top of previous, unapproved rate increases; various delivery point disputes between CP & L and the Plaintiff EDCs such as restricting the EDCs to low-voltage delivery points, placing maximum restrictions on delivery and, when

loads grew, unreasonably requiring the EDCs to invest in transmission facilities, and limiting the amount of electric capacity available at a particular delivery point; and CP & L's acquisition of other electric systems like Domestic Electric Service in 1978 and the distribution system of the Village of Pinehurst, North Carolina, in 1981, which tightened their monopolistic control over wholesale power supply in eastern North Carolina.

21. In this case, some of CP & L's alleged anticompetitive acts took place prior to the statute of limitations cut-off date of August 17, 1973, and other acts took place after that date. The law in situations like this is:

[W]here defendants are alleged to have committed acts injurious to a plaintiff pursuant to an unlawful conspiracy, and where defendants committed some such acts more than four years before plaintiff commenced suit, and other such acts less than four years before plaintiff commenced suit, the plaintiff is allowed to recover damages resulting only from those acts committed less than four years before commencement of his suit.

*Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029, 1034 (5th Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977).

speculative, and then only to that portion. As the Supreme Court further explained in *Zenith:*

> [I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date.... [I]t is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.
>
> In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.

*Id.* at 339, 91 S.Ct. at 806 (citations omitted).

In summary, a claim of the Plaintiffs will not be barred by the statute of limitations if (1) CP & L committed anticompetitive overt acts relating to that claim which injured the Plaintiffs on or after August 17, 1973, since that is within four years of the date the Plaintiffs filed their complaint; or (2) although the overt acts relating to that claim happened prior to August 17, 1973, the Plaintiffs were not injured until on or after that date because a cause of action accrues only if an overt act causes some injury; or (3) even if the Plaintiffs suffered some injury prior to August 17, 1973, if future damages were too speculative prior to that date then the portion of the claim relating to future damages survives, although the claim for past damages is barred.

### A. Acts of CP & L prior to August 17, 1973

It is undisputed that many of CP & L's alleged anticompetitive overt acts took place well before August 17, 1973. Even some entire claims are based upon activities of CP & L happening well before this date. For example, the Plaintiffs' predatory pricing and price-fixing claims pursuant to Sections 1 and 2 of the Sherman Act stem from the 7.5 mills per kwh rate that CP & L charged the rural EDCs from 1945 to 1971. Also, many of the Plaintiffs' claims[22] relating to the withholding of power exchange services and refusals to deal happened prior to August 17, 1973.

The Plaintiffs argue that the statute of limitations has not run on any of their claims because there was no fact of damage until after August 17, 1973, and, thus, their cause of action did not accrue outside the limitations period. Fact of damage occurs when there is "proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (emphasis in original).

■ "The term 'fact of damage' can be likened to the causation element in a negligence cause of action. The term means that the antitrust violation caused injury to the antitrust plaintiff." *Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 435 (5th Cir.1985) (quoting *Alabama v. Blue Bird Body Co.,* 573 F.2d 309 [5th Cir.1978]). The normal inquiry on fact of damage is whether plaintiff's evidence shows that defendant caused injury to his business. *Id.* In the context of this motion, in which Defendant is arguing that fact of damage occurred prior to the limitations period, the court must deter-

---

**22.** The Plaintiffs allege CP & L engaged in various anticompetitive acts relating to power exchange services such as refusing to wheel power, opposing Santee–Cooper, opposing ventures of the Southeastern Power Administration, forming CARVA, refusing joint ownership of nuclear power plants, forming the Southeastern Reliability Counsel, and opposing the Yankee–Dixie project.

mine when it was that Plaintiffs knew or should have known "as a matter of fact and with a fair degree of certainty" that Defendant caused Plaintiffs' injury. *See id.; see also Brunswick Corp. v. Riegel Textile Corp.,* 578 F.Supp. 893, 898 (N.D.Ill.1983), *aff'd,* 752 F.2d 261 (7th Cir. 1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985) (using "knew or could have discovered" standard).

■ According to Plaintiffs, the fact of damage from CP & L's anticompetitive activities occurred in 1976 when the EDCs began paying CP & L more for wholesale power than they would have paid had they built their own G & T system back in the 1950's. Prior to 1976, the EDCs supposedly suffered no damage because CP & L's power was the cheapest available.[23] For support, Plaintiffs rely on the proposition that "[a]lthough the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 295 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

*Berkey* is distinguishable from this case and therefore inapplicable. In *Berkey,* Berkey Photo, Inc., sued Eastman Kodak Company in its capacity as a customer [24] claiming that it was paying monopoly prices for the supplies it purchased. By contrast, all the claims in this case rest on NCEMC's status as a potential competitor of CP & L, unlawfully excluded from the G & T business.[25] Moreover, Kodak allegedly priced below-cost in order to obtain monopoly power and once this power was achieved charged monopoly prices in order to recoup any losses. The concern of the Second Circuit was that "it would undercut enforcement of the Sherman Act to hold that, if a monopolist merely retains its illicit market control for four years after its last anticompetitive action, it may charge an exorbitant price until its power is eviscerated in an appropriate suit for equitable relief." 603 F.2d at 296 (footnote omitted). To prevent such recoupment, the court tolled the limitations period. Recoupment is not a concern in this case. Plaintiffs' expert does not contend CP & L ever recouped any monopoly profits [26] and the EDCs admit that they have recovered over-

---

**23.** Plaintiffs claim that only in 1976 did its own hypothetical system show a "cumulative advantage" over the rates it was paying Defendant. Plaintiffs' Response Opposing Defendant's Motion for Summary Judgment under the Statute of Limitations, at 74 (Jan. 14, 1986). Plaintiffs' damage study shows that from 1962 to 1966 and in 1968 the cost of power from Plaintiffs' hypothetical system would have been less overall than what they paid to CP & L. Plaintiffs' expert, however, discounts this damage as not robust, Affidavit of Harold H. Wein, at 21 (Jan. 13, 1986), and that the cumulative position was negative at that time. *Id.* at 17.

**24.** The plaintiff in *Berkey* stood in a multi-faceted relationship with Kodak. Berkey Photo, Inc., was a customer of Kodak in the film, color print paper, and photo-finishing equipment and supplies markets, and a competitor of Kodak in photo-finishing services and camera sales. Berkey sued Kodak under the Sherman Act alleging, in part, that it was paying excessive prices as a customer of Kodak and, as a result, Kodak gained an unfair advantage over Berkey as a competitor in the photo-finishing services market.

**25.** As noted *supra* note 7, even if the sixteen EDCs are properly classified as customers of CP & L, their rights are the same as NCEMC's because all the damage in this case comes from NCEMC's supposed exclusion from the G & T business. If the Plaintiff EDCs were suing as customers, their damage theory would be the difference between the inflated monopolistic price that CP & L is charging them for power and a competitive price. This is not their theory. In fact, the Plaintiff EDCs admit that they have already recovered overcharges in proceedings before the Federal Energy Regulatory Commission. Instead, the Plaintiff EDCs are asking for the difference between what they paid CP & L for power and the cost of power from a hypothetical G & T plan which allegedly would have been built absent CP & L's bad conduct. Therefore, if NCEMC has no claim against CP & L neither do the Plaintiff EDCs.

**26.** *See* Transcript of Hearing on Motions for Summary Judgment, at 16 (May 2, 1990) (counsel for Plaintiffs indicating that recoupment was not part of their theory). Plaintiffs rely on a theory of cross-subsidization, whereby Defendant suffered no losses by having other customers make up its deficiencies as it went. *See infra* pp. 336–38.

charges by CP & L through the regulatory process. Instead, the alleged harm to the EDCs is that CP & L's below-cost pricing prevented NCEMC from building a G & T system.

Judge Posner, a former antitrust professor, has explained that to a potential competitor "[e]xclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs ... even though, in the nature of things, the victim's losses lie mostly in the future." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir.1984) (citing 2 P. Areeda & D. Turner, *Antitrust Law* 232–33 [1978]). *See Omni Outdoor Advertising v. Columbia Outdoor Advertising*, 891 F.2d 1127, 1143 (4th Cir.1989) (" '[In exclusion-from-a-market cases] ... "just and reasonable inference[s] from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business [allows a conclusion] that defendants' wrongful acts had caused damage to the plaintiffs." ' " [quoting *Zenith*, 395 U.S. at 123–24, 89 S.Ct. at 1576–77 [first bracket in original]]), *rev'd on other grounds*, —— U.S. ——, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). The holding in *Berkey* is not to the contrary. The Second Circuit clearly stated that a monopolist's rival was injured at the time anticompetitive *conduct* occurs. 603 F.2d at 295 (emphasis added).

NCEMC was first injured in 1945 when it could not obtain a two per cent (2%) loan from the REA due to the low rates that CP & L, Virginia Electric & Power Company, and Tide Water Power Company charged for wholesale power and when CP & L withheld access to power exchange services. Without financing or access to power exchange services, NCEMC could not build a G & T system and enter that business. It is undisputed that Plaintiffs knew as early as 1945 that Defendant's low rate was preventing them from obtaining the loan. *See* Deposition of David A. Springs, at 463–64 (Sept. 23, 1985). Plaintiffs' evidence shows that rather than go into court in the 1940's or '50's or '60's to challenge CP & L's activities, they chose to wait until CP & L decided to raise their rates, meanwhile reaping the benefit of a lower rate. *Id.* at 483.[27] Further, as of 1970, Plaintiffs had been discussing bringing suit to challenge CP & L for some time, and only in 1977, with the benefit of hindsight, did they choose to sue.[28]

Plaintiffs also argue that because they could not show monetary damages until 1976 their cause of action did not accrue until then, notwithstanding that the acts of Defendant occurred in the 1940's, '50's and '60's. As indicated above, exclusion from the G & T business beginning in 1945 was itself injury and constituted fact of damage. Moreover, the court is not persuaded by Plaintiffs' evidence.

Plaintiffs' study shows a cumulative advantage trend beginning in 1976 and assert that the difference in actual and hypothetical cost from then until trial constitutes past damages. Plaintiffs disregard the damage suffered from 1962 to 1966 and in 1968 as not robust or supportive of a claim. *See supra* note 23. While Plaintiffs' damages may be greater in 1976 or 1991 than in 1962, monetary damage occurred in 1962 and so, under Plaintiffs' theory requiring monetary damage, their cause of action accrued. Additionally, in computing damages, Plaintiffs' study arbitrarily sets the cumulative total at zero (0) in 1976 and

---

**27.** The testimony was as follows:

"Q. But rather than go into a court and try to get a court order to stop CP & L, you chose to wait and get the benefit of the low rate until such time as CP & L decided to raise it?
A. [Springs] I think that's right. I believe that's correct."
Deposition of David A. Springs at 483 (Sept. 23, 1985).

**28.** *See* Deposition of David A. Springs at 473–74 (Sept. 23, 1985). The testimony was as follows:

"Q. ... At point in time [1970], was there any discussion between you or anyone else at Southern Engineering or with the plaintiffs about going to court to challenge CP & L for what you believed to be its improper conduct over the last 25 years on its low rate which you believe kept you out of the G & T business?
A. [Springs] Well, that kind of discussion had been going on for a long period of time, but I don't know that that would—that right there. We didn't know what was going to happen. I don't know that we we [sic] could have even— you know, this is hindsight."

accumulates from that point. *See* Study of Southern Engineering Co. (Mar. 20, 1985) (Exhibit 9 of Appendix to Defendant's Memorandum in Support of Motion for Summary Judgment under the Statute of Limitations).[29] In fact, starting in 1954, when Plaintiffs allegedly would have had a G & T system on line absent Defendant's anticompetitive acts, it is not until 1984 that the cumulative impact becomes positive. *Id.* It would be absurd to require plaintiffs in predatory pricing suits to wait until the disadvantage to them was positive to bring suit. Plaintiffs' cause of action accrued when they first suffered injury and damage. Their accumulation theory must therefore be rejected.

Lastly, Plaintiffs' expert testified that Type II damages—reflecting the difference in cost of power to Plaintiffs—"could be made at any time." Deposition of Harold H. Wein, at 773–74, 785 (Sept. 9, 1985).[30] Plaintiffs' study is no more than a summa-

tion of damages that began accumulating in 1962. Therefore, even under Plaintiffs' theory, this cause of action accrued no later than 1962.

The Plaintiff EDCs cannot enjoy the benefits of low wholesale power rates for decades without a complaint and then, once prices finally rise, complain that those same low prices excluded NCEMC from the G & T business to their detriment. The appropriate time for this complaint would have been either during the 1950's after the REA turned down NCEMC's two per cent (2%) loan application, or in the 1960's after Plaintiffs first suffered monetary damage.[31]

■ The Plaintiffs argue that even if their claim for past damage is time-barred their claim for future damage is not because the future damage from market exclusion was entirely speculative prior to August 17, 1973. It is clear that "uncertain *damage*, which prevented recov-

---

**29.** Plaintiffs justify this in two ways. First, they argue that they did not pay monopoly prices—overcharges—until 1976 and under *Berkey* only then did their cause of action accrue. Plaintiffs' Response Opposing Defendant's Motion for Summary Judgment under the Statute of Limitations, at 72–74. Second, Plaintiffs argue that only in 1976 "is the trend heavily in favor of the hypothetical system." *Id.* at 75. The court finds both of these reasons equally unpersuasive.

**30.** The testimony was as follows:

"Q. And after these Type II damages the difference between CP & L's rate and the rate from that system could be calculated essentially at any time, you just pick your point?
A. [Wein] Engineers can calculate these things at any time. The computations don't depend on anything.
. . . .
A. [Wein] . . . The computation of Southern could be made at any time.
Q. You mean the computations in their damage studies?
A. [Wein] Computations such as are in the damage studies.
Q. Yes.
A. [Wein] Yes, they could calculate Type I and Type II type damages. Insofar as their art is involved they could do that.
. . . .
Q. You agree with me that in looking at Wein Exhibit 3 [damage study by Southern Engineering], that in 1966 Southern Engineering could have done all the calculations shown on that exhibit up through 1966?

A. [Wein] Yes, they could have done that. I agree.
Q. And they would have shown these Type II damages in the years '62 through '66?
A. [Wein] They could have shown Type II damages, yes."
Deposition of Harold H. Wein, at 773–74, 785 (Sept. 9, 1985).

In an affidavit supporting Plaintiffs' opposition to summary judgment Professor Wein seeks to explain his deposition testimony. He asserts that the ability of the engineers to make calculations or computations does not mean that they would have shown damages. Affidavit of Harold H. Wein, at 13 (Jan. 13, 1986) (contained in Exhibit 1 of Appendix to Plaintiffs' Response Opposing Defendant's Motion for Summary Judgment under the Statute of Limitations). Professor Wein cannot seek to explain away his deposition testimony by use of affidavit. *Cf. Rohrbough v. Wyeth Laboratories, Inc.,* 916 F.2d 970 (4th Cir.1990); *Miller v. FDIC,* 906 F.2d 972 (4th Cir.1990). The court finds the deposition testimony to be more credible than the *ex parte* affidavit and, while considering the affidavit's explanation, will credit the deposition and Plaintiffs' own damage study. *See supra* note 23. *See Rohrbough,* 916 F.2d at 976; *Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir.1984).

**31.** Even if NCEMC and the EDCs are classified as customers of CP & L instead of potential competitors, there still was fact of damage prior to August 17, 1973. Thus, as customers NCEMC and the EDCs were first injured by CP & L in 1962.

ery" must be distinguished from "uncertain *extent* of damage, which did not prevent recovery." *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 73 (9th Cir.) (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 [1946]; *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 565–66, 51 S.Ct. 248, 251–52, 75 L.Ed. 544 [1931]), *cert. denied*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). Once fact of damage has been proven, the extent of damage must be shown. However, because damages in antitrust cases are rarely susceptible to accurate computations courts are lenient in accepting proof of the extent of damage and allow "the jury [to] make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act upon probable and inferential, as well as direct and positive proof.'" *Bigelow*, 327 U.S. at 264, 66 S.Ct. at 579 (quoting *Story*, 282 U.S. at 564, 51 S.Ct. at 251). "This rationale takes on special force in market foreclosure cases because probable and inferential proof is all that is available to hypothesize profits." *Metrix Warehouse v. Daimler–Benz Aktiengesellschaft*, 828 F.2d 1033, 1043 n. 20 (4th Cir. 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1753, 100 L.Ed.2d 215 (1988).

The Plaintiffs argue they could not reasonably quantify future damage from NCEMC's exclusion from the G & T business during the 1950's and 1960's. With 20/20 hindsight, they cite numerous factors—the abrupt change in conditions in the electricity market following the Arab oil embargo, the timing of future CP & L rate increases, and changes in leadership at the Federal Energy Regulatory Commission—which made any future damage estimate entirely speculative. Plaintiffs point out that the Supreme Court has stated claims for future damages probably would get "short shrift in the lower courts" if a plaintiff had to "predict market conditions and the performance of one competitor in that market five to 10 years hence." *Ze-*

*nith*, 401 U.S. at 342, 91 S.Ct. at 808. However, the statute of limitations is not tolled simply in order to wait and see the condition of the particular market. *Brunswick*, 752 F.2d at 271. Indeed, since *Zenith* most circuit courts have declined to label future damage claims speculative. *See, e.g., Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 240 (9th Cir.1987) (lost profits for a business delayed in entering a market not speculative); *Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d 74, 83 (6th Cir.1981) (uncertain market conditions caused by Arab oil embargo did not make future damage claim speculative); *Charlotte Telecasters, Inc. v. Jefferson–Pilot Corp.*, 546 F.2d 570, 573 (4th Cir.1976) (future damage claim of potential, but so far excluded, competitor in cable television market not speculative). The proper focus is whether future damages are speculative as viewed from the time the cause of action accrued without consideration for actual events that have occurred since that date.

In this case, the Plaintiffs' future damage claim is not speculative. Plaintiffs assert that Type I damages sought by them are a reasonable proxy for all future damage resulting from CP & L's exclusionary conduct. As the testimony of Plaintiffs' expert indicates:

> Type I damages represent the cost of constructing that system itself, less the depreciated value of the hypothetical system, as of the projected close of trial in mid–1986. This measure is a proxy for all the future Type II damages resulting from the persisting harm of defendant's past misconduct. Type I damages approximate the present worth of the future differences in plaintiffs' costs per kwh and purchased power at CP & L's rates.

Affidavit of Harold H. Wein, at 10 (Jan. 13, 1986) (contained in Exhibit 1 of Appendix to Plaintiffs' Response Opposing Defendant's Motion for Summary Judgment under the Statute of Limitations). The calculation of Type I damages is simple and could have been made at any time since NCEMC's exclusion from the G & T market began.[32]

---

**32.** Wein admitted at his deposition that Type I damages could have been calculated in the

It requires only that Plaintiffs estimate what the cost of building a G & T system sufficient to service the EDC's needs would have been in 1950 when they allegedly would have begun construction—a calculation done for the present study—and a like estimate for the year of the trial of a timely suit. Type I damage, then, would be a simple comparison of the costs. Plaintiffs' future damages were not speculative.

The court finds that Plaintiffs' cause of action relating to overt acts of Defendant CP & L prior to August 17, 1973, accrued outside the limitations period. The court also finds that any future damages resulting from the pre-limitations acts were not speculative. Therefore, the Plaintiffs' claims relating to overt acts of CP & L prior to August 17, 1973, are barred by the statute of limitations.

### B. Acts of CP & L on or after August 17, 1973

■ Several overt acts by CP & L allegedly injurious to NCEMC and the EDCs happened after the statute of limitations cut-off date of August 17, 1973. These overt acts include CP & L's refusal to deal with the NCEMC concerning power exchange services, which prevented NCEMC from obtaining power from Georgia Power Company's Vogtle Nuclear Power Plant; CP & L's refusal to sell NCEMC joint ownership in the Brunswick and Harris Nuclear Power Plants; CP & L's continued opposition to Electric Power in the Carolinas, as well as other efforts by NCEMC and the EDCs to obtain their own G & T services; delivery point disputes between the Plaintiff EDCs and CP & L; and acquisitions by CP & L of other electric distribution systems which increased its control over G & T services in eastern North Carolina. Because these overt acts took place within four years of the time the Plaintiffs filed their complaint, claims relating to these acts are not barred by the statute of limitations.[33]

CP & L does not dispute this obvious point. Instead, it argues that the Plaintiffs have not claimed any damage from the aforementioned post-limitations date overt acts. In support of this position, CP & L relies on affidavit and deposition testimony of Harold Wein, the architect of the Plaintiffs' damage theory. Wein admits that his theory does not allege particularized damage from acts of CP & L on or after August 17, 1973. Seizing upon this admission, CP & L contends that all the Plaintiffs' claims should be dismissed because the Plaintiffs were not damaged by acts of CP & L occurring within the limitations period.

CP & L overstates its position. First, Wein never stated that the post-limitations acts of CP & L did not damage the Plaintiffs, only that he did not formulate a separate damage theory for those acts. Because the court will rule that the statute of

---

1960's. *Deposition of Harold H. Wein*, at 772–73, 785–86 (Sept. 9, 1985) (contained in Exhibit 2 of Appendix to Defendant Carolina Power & Light Company's Memorandum in Support of Motion for Summary Judgment under the Statute of Limitations).

"Q. Your Type I damages presently, which are the costs of building this system of plaintiffs, ... I take it the assumption under those Type I damages is that plaintiffs, absent the violations of CP & L, would have built that system starting in 1954?

A. [Wein] Yes.

Q. Am I correct, then, that in 1954 you could have calculated Type I damages?

A. [Wein] Well, sure, ... I could have calculated what it costs to have build [sic] a plant in 1954, and gone through the same procedure as they did in March [1985].

Q. And I take it also in 1970 if you had brought the suit at that time, you would have calculated the Type I damages?

A. [Wein] Yes. I think Southern would also be able to calculate the cost of building a plant or system of plants,...."
*Deposition of Harold H. Wein*, at 772–73 (Sept. 9, 1985).

Professor Wein, in his affidavit, states that while such calculations could have been made they would not have shown non-speculative damages. *See supra* note 30.

**33.** Most of these claims fit into Section 2 of the Sherman Act as examples of the unlawful maintenance of monopoly power. A few claims such as CP & L's opposition—along with Duke Power Company, South Carolina Electric and Gas Company, and Virginia Electric and Power Company—to Electric Power in the Carolinas may fit into Section 1 of the Sherman Act as a conspiracy in restraint of trade.

limitations bars the Plaintiffs' claims and evidence relating to pre-August 17, 1973, acts of CP & L, the extent of the Plaintiffs' damage is admittedly uncertain. However, the court cannot rule as a matter of law that NCEMC and the EDCs have suffered no damage from acts of CP & L taking place on or after August 17, 1973. Second, NCEMC seeks a permanent injunction requiring CP & L to deal with it in good faith as if there was an unconcentrated and competitive power exchange market and to provide wheeling services permitting it to integrate the electricity loads of the EDCs. This request for injunctive relief is not barred by the statute of limitations due to the overt acts of CP & L which have taken place well after August 17, 1973.[34] Therefore, the court cannot grant CP & L's motion to dismiss all of the Plaintiffs' claims on statute of limitations grounds.

## II. *Sufficiency of the Evidence*

For purposes of this motion, CP & L characterizes the Plaintiffs' various claims as follows: CP & L priced predatorily low for several decades in order to prevent NCEMC from entering the G & T business and keep the EDCs as captive customers. CP & L argues that summary judgment should be granted on all the Plaintiffs' claims because they are implausible and the evidence is insufficient to substantiate these implausible allegations. This motion is based upon the Supreme Court's decision in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), which provides guidelines for summary judgment analysis in the antitrust context. Although the genuine issue of material fact summary judgment standard[35] was not changed, the Supreme Court distinguished evidence sufficient to raise a genuine issue of material fact in a predatory pricing antitrust case from evidence insufficient to do so. In *Matsushita*, the Court instructed that "[i]t

follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." 475 U.S. at 587, 106 S.Ct. at 1356. Therefore, the appropriate analysis is two-fold. First, a court should determine whether a plaintiff's antitrust claim is plausible. If it is, summary judgment cannot be granted unless no evidence supports the claim. If it is not, the court should take the second step and examine whether more persuasive evidence exists to support the implausible claim. If no such persuasive evidence exists summary judgment can be granted in favor of the defendant.

If a plaintiff's predatory pricing claim is implausible, actual cost data indicating below-cost pricing is the only evidence which the Supreme Court cites as more persuasive evidence sufficient to survive a summary judgment motion. *Id.* at 584 n. 8, 585 n. 9, 594 n. 19, 106 S.Ct. at 1355 n. 8, 1355 n. 9, 1360 n. 19. The Court notes that certain evidence is insufficient to avoid the dismissal of implausible claims. Neither evidence of conduct by a defendant which harms competition but benefits competitors nor evidence of conspiracies to set maximum prices above market levels or set minimum prices at any level is sufficient to survive a summary judgment motion made against a competitor. *Id.* at 582–84 & n. 8, 106 S.Ct. at 1353–54 & n. 8. The Court also hinted that documentary evidence indicating a defendant's predatory intent is insufficient for an implausible antitrust claim to survive a motion for summary judgment. *Id.* at 585 n. 9, 106 S.Ct. at 1355 n. 9 ("As a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference

---

**34.** The fact of damage question has no bearing on NCEMC's ability to obtain injunctive relief since "threatened loss or damage" as opposed to actual injury is all that is needed for the issuance of an injunction. 15 U.S.C. § 26; *see Zenith*, 395 U.S. at 130, 89 S.Ct. at 1580 (injunctive relief available even though no actual injury suffered).

**35.** *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Langham–Hill Petroleum, Inc. v. Southern Fuels Co.*, 813 F.2d 1327, 1329 (4th Cir.), *cert. denied*, 484 U.S. 829, 108 S.Ct. 99, 98 L.Ed.2d 60 (1987).

that rational businesses would not enter into conspiracies such as this one.").

### A. The pricing claims

■ Examining the plausibility of the Plaintiffs' theory is the first step in evaluating their pricing claims. The theory behind the Plaintiffs' pricing claims is that CP & L set prices to the EDCs at a predatory 7.5 mills per kwh rate for several decades, and encouraged other utilities to do the same,[36] to make the EDCs dependent upon CP & L for electricity and to prevent either NCEMC or the individual EDCs from obtaining their own G & T system.

This theory is implausible because the loss to CP & L from decades of below-cost pricing would be so large that any long-term recoupment would be unrealistic. As the Supreme Court noted in *Matsushita*, predatory pricing schemes are inherently speculative because the short-term loss is definite while the long-term gain is uncertain. 475 U.S. at 588–89, 106 S.Ct. at 1356–57. To recoup from decades of below-cost pricing, CP & L would have to recover the present value of its losses plus a normal rate of return on the investment.

Only then could CP & L harvest additional gains. Recoupment is especially unlikely in the utility industry because CP & L is regulated and cannot set its prices without the approval of a regulatory body. From 1945–64, CP & L's rates to the EDCs were set by the North Carolina Utilities Commission, and from 1964 to the present its rates have been regulated by the Federal Power Commission and its successor, the Federal Energy Regulatory Commission. Under either regulatory scheme, utility rates must be just and reasonable.[37] That the alleged predatory pricing conspiracy involved several utilities makes it even more implausible because losses must be allocated and each utility has an incentive to free-ride off the others. *Matsushita*, 475 U.S. at 590, 106 S.Ct. at 1357.

The Plaintiffs counter that CP & L did not need to recoup because no money was lost on the 7.5 mills per kwh rate due to cross-subsidization.[38] The Plaintiffs' theorize that CP & L subsidized its losses to the EDCs with excess profits obtained from its municipal and retail customers.

The only case the Plaintiffs cite[39] supporting the cross-subsidization theory is

---

**36.** The court notes that in 1955 the North Carolina Supreme Court found that the 7.5 mills per kwh rate "was approved many years ago at the request of the Federal Government." *State v. Municipal Corps. of Scotland Neck*, 243 N.C. 193, 200, 90 S.E.2d 519, 526 (1955).

**37.** N.C.Gen.Stat. § 62–130 (1989) provides that the mission of the North Carolina Utilities Commission is to "make, fix, establish or allow just and reasonable rates for all public utilities subject to its jurisdiction." Utility rates regulated by the Federal Government also must be just and reasonable. 16 U.S.C. § 824d(a).

**38.** Cross-subsidization means that a company subsidizes losses on the sale of goods or services to a customer or in a market with excess profits gained from other customers or in other markets.

**39.** More recent cases recognize that cross-subsidization can be a viable recoupment strategy in some settings. *See, e.g., California v. FCC*, 905 F.2d 1217, 1233–38 (9th Cir.1990) (significant risk of cross-subsidization from undetected cost-shifting by the Bell Operating Companies); *United States v. Western Elec. Co.*, 900 F.2d 283, 297–300 (D.C.Cir.1990) (cross-subsidization by the Bell Operating Companies recognized as a threat to consumer welfare). These cases almost all originate from the breakup of AT & T. Cross-subsidization was likely in this setting because AT & T was so large that its product-line "cost data are apparently impenetrable even to its own regulators," *AT & T*, 524 F.Supp. at 1370, and because it was easy for the Bell Operating Companies to shift costs from the unregulated portion of their business to the regulated portion of their business. *California*, 905 F.2d at 1234. These concerns are not present in this case because CP & L's electricity business is totally regulated and there is no evidence suggesting CP & L is too large for effective regulatory oversight. Furthermore, cases from other regulated industries have rejected cross-subsidization out of hand. *See, e.g., LaMoille Valley R.R. v. ICC*, 711 F.2d 295, 317 (D.C.Cir.1983) ("the ICC's emphasis on [defendant] Canadian National's financial strength and neglect of the profitability of the Grand Trunk Eastern line ignores Canadian National's incentive to maximize profits by shedding money-losing operations. Nothing in the record supports the implausible proposition that Canadian National will indefinitely subsidize losses on its Grand Trunk Eastern line."). Cross-subsidization has even been rejected in cases arising from the telephone industry. *See MCI Communications Corp. v. AT & T*, 708 F.2d 1081, 1123–24 (7th Cir.1983); *Northeastern Tel. Co. v. AT & T*, 651

*United States v. AT & T,* 524 F.Supp. 1336 (D.D.C.1981).[40] The district court in *AT & T,* despite labeling cross-subsidization "a novel approach" which involves "the mapping of virgin territory," *AT & T,* 524 F.Supp. at 1370, did not dismiss the government's antitrust claim at summary judgment due to the complexity of the issues.

Cross-subsidization is no more plausible on these facts than recoupment over time. First, the Supreme Court rejected cross-subsidization as a viable recoupment theory in *Matsushita.*[41] The Supreme Court decided this theory was implausible because:

Whether or not petitioners have the *means* to sustain substantial losses in this country over a long period of time, they have no *motive* to sustain such losses absent some strong likelihood that the alleged conspiracy in this country will eventually pay off ... [and] ... [m]ore important, there is nothing to suggest any relationship between petitioners' profits in Japan and the amount petitioners could expect to gain from a conspiracy to monopolize the American market.

*Matsushita,* 475 U.S. at 593, 106 S.Ct. at 1359. The Plaintiffs have the same problem. Although their economic expert theorizes that cross-subsidization by CP & L was feasible, after years of discovery there is no evidence indicating that the 7.5 mills per kwh rate was cross-subsidized by other customers of CP & L.[42] Without such evidence, it is implausible for a profit-maximizing business like CP & L to sustain losses

for many years on power supplied to the rural EDCs even if it could afford to do so.

Second, even if cross-subsidization was not generally implausible, its likelihood in this case is questionable. Plaintiffs have argued both that the 7.5 mills rate was predatory and that the North Carolina Utilities Commission was duped by Defendant CP & L into authorizing rates allowing predation and simultaneous recoupment because of the failure to perform a cost study that would show automatic cross-subsidization. Plaintiffs' Response Opposing Summary Judgment on Grounds of Insufficient Evidence of Monopolization, at 25–28 (Nov. 2, 1987); Transcript of Hearing on Motions for Summary Judgment, at 58–64 (May 2, 1990). The court finds these arguments unpersuasive based on *State v. Municipal Corps. of Scotland Neck,* 243 N.C. 193, 90 S.E.2d 519 (1955). In 1953, Virginia Electric & Power Company applied to the North Carolina Utilities Commission for a general rate increase to some of its customers. Several municipalities opposed the rate increase citing the lower 7.5 mills per kwh rate charged to the rural EDCs. The municipalities argued that the higher rates to them subsidized the lower rates to the rural EDCs. The North Carolina Utilities Commission ruled in favor of Virginia Electric & Power Company, holding that the 7.5 mills per kwh rate to the rural EDCs did not result in a higher rate for the municipalities.[43] The North Carolina Supreme Court upheld this ruling, stating:

F.2d 76, 89 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).

**40.** In *AT & T,* the government claimed that AT & T set its prices high in the MTS and WATS areas where it enjoyed a monopoly and low in private line areas where it faced competition. *AT & T,* 524 F.Supp. at 1365. The district court further opined that recoupment through cross-subsidization is an especially attractive strategy for a regulated utility. *Id.* at 1369.

**41.** In *Matsushita,* American television manufacturers claimed that Japanese television manufacturers illegally conspired to drive them out of the United States market by maintaining artificially high prices for televisions in Japan and, at the same time, maintaining below-cost prices for televisions exported to and sold in the United States. *Id.* 475 U.S. at 577–78, 106 S.Ct. at 1351–52. The low American television prices

were allegedly cross-subsidized by high television prices in Japan.

**42.** The Plaintiffs infer the existence of cross-subsidization from the fact that CP & L charged a lower rate to the EDCs than to other customers. But differences in customer rates does not prove cross-subsidization. The Plaintiffs have failed to offer substantial evidence that the low rates to the EDCs were causally related to the higher rates that other customers of CP & L paid.

**43.** The Commission's order stated that:

The municipalities in their protest seemed to feel that this low rate which the Company is charging the REA Cooperatives resulted in a higher rate which the municipalities were asked to pay. We are quite certain that this position of the municipalities is not well taken

The conditions under which REA Cooperatives must operate, the necessity for constructing and maintaining miles and miles of lines through sparsely settled rural areas, and the consequent line losses, are sufficient to justify serving municipalities engaged in selling electric energy for profit under a different schedule from the one applicable to the REA Cooperatives which are created and operated on a nonprofit basis pursuant to the established public policy of the State and Federal Government.

*Scotland Neck,* 243 N.C. at 202, 90 S.E.2d at 527.

While *Scotland Neck* was not an antitrust case and does not reject cross-subsidization as such, it indicates that the North Carolina Utilities Commission was aware of differing costs and situations warranting a deviation from the prevailing rate. The case shows a clear rejection of the argument that one class of purchasers' rates were dependent on and derived from that of another purchaser. Therefore, it is implausible that CP & L could have engineered a regulatorily authorized cross-subsidy. Also, the North Carolina Supreme Court found, as a fact, that the 7.5 mills per kwh rate was requested by the Federal Government.

Even if recoupment over time and recoupment by cross-subsidization are implausible, the Plaintiffs contend CP & L did

not need to recoup because its only goal was to prevent NCEMC from obtaining a G & T system. However, no court has held that it makes economic sense for a company to engage in predation aimed solely at preventing a potential rival from competing without the prospect of long-term recoupment.[44] The Supreme Court in *Matsushita* stated that "[t]he success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." 475 U.S. at 589, 106 S.Ct. at 1357. Absent that assurance, "predatory pricing schemes are rarely tried." *Id.*[45]

Under *Matsushita,* the next step in the summary judgment analysis is to determine if more persuasive evidence exists which excludes the possibility of lawful competition and substantiates the Plaintiffs' implausible pricing claims. 475 U.S. at 597–98 & n. 21, 106 S.Ct. at 1361–62 & n. 21 (citing *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 763–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 [1984]). In *Matsushita,* the Supreme Court considered the type of below-cost pricing evidence sufficient to overcome an implausible predation theory. It indicated that the only reliable expert studies of cost were based upon "actual cost data" covering the alleged predatory period and that expert studies based upon "assumptions" about defen-

---

for the reason that if the Company had to construct the various transmission lines and extend electric service to the various sections of their territory which are now served by the REA Cooperatives, that the over-all operating expenses of the Company would be greatly increased and the other customers would have to pay more to compensate for the loss sustained in serving the same rural customers direct. We therefore find as a fact that the protesting municipalities are not entitled to the REA rates.

Order of North Carolina Utilities Commission (June 1, 1954), *quoted in Scotland Neck,* 243 N.C. at 200–01, 90 S.E.2d at 526.

**44.** The cases which the Plaintiffs cite for support—*Instructional Sys. Dev. Corp. v. Aetna Casualty & Surety Co.,* 817 F.2d 639 (10th Cir.1987); *Marsann Co. v. Brammall, Inc.,* 788 F.2d 611 (9th Cir.1986); *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818 (6th Cir.1982); *William Inglis & Sons Baking Co. v. ITT Continental*

*Baking Co.,* 668 F.2d 1014 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427 (7th Cir.1980); *Pacific Eng'g & Prod. Co. v. Kerr–McGee Corp.,* 551 F.2d 790 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *International Air Indus., Inc. v. American Excelsior Co.,* 517 F.2d 714 (5th Cir.1975), *cert. denied,* 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976)—are inapplicable. These cases recognize that predation is more likely to occur in markets with high entry barriers because rivals cannot easily enter the market to prevent recoupment. But none of these decisions stand for the proposition that erecting barriers to entry rather than recoupment is a plausible goal of a predatory pricing scheme.

**45.** The Supreme Court also stated that predation is not "rational" without the expectation of recovering "more than the losses suffered." 475 U.S. at 588–89, 106 S.Ct. at 1356–57.

dant's costs were of "little probative value." 475 U.S. at 594 n. 19, 106 S.Ct. at 1360 n. 19. The court finds that no such evidence exists in this case. The Plaintiffs' evidence of predation comes exclusively from the work of their economic expert. Wein's analysis is exactly the sort of speculative cost evidence that the Supreme Court has indicated is of little probative value. The only evidence Wein presents from CP & L's actual cost data relates to CP & L's costs at its Lumberton Power Plant in 1949–50. This evidence is not sufficient to survive summary judgment because this period is too brief to make a conclusion about below-cost pricing over twenty-six (26) years; Lumberton was not CP & L's only power plant; [46] and CP & L's costs in 1949–50 indicate nothing about its intentions in 1945 when it set the 7.5 mills per kwh rate.

Furthermore, the Plaintiffs' direct and circumstantial evidence relating to pricing is insufficient to withstand summary judgment.[47] The Plaintiffs' direct evidence is sparse and consists of isolated statements by CP & L executives. There is no smoking gun in any documents indicating that CP & L's motive in setting the 7.5 mills per kwh rate was to prevent competition in the G & T business. The Plaintiffs' circumstantial evidence is equally unpersuasive because none of it excludes the possibility of lawful motivations behind CP & L's pricing. In fact, there is little evidence supporting the conclusion that the 7.5 mills per kwh rate was predatory. The evidence reflects that this rate was (1) offered to help the EDCs service rural areas at the request of Congress; (2) more cost effective for CP & L than having to provide electricity to the rural areas itself; (3) maintained during a period when electricity costs were declining; and (4) accepted readily by the EDCs.[48] Because no more persuasive evidence exists to substantiate the Plaintiffs' implausible pricing claims, summary judgment is appropriate.

### B. The non-pricing claims

■ The Plaintiffs seek damages and an injunction from their non-pricing claims brought pursuant to Sections 1 and 2 of the Sherman Act. These claims revolve around over fifty (50) years of alleged exclusionary conduct by CP & L that prevented NCEMC from building a G & T system and the EDCs from obtaining electric independence from CP & L. CP & L's overt acts center around numerous refusals to deal over power exchange services with NCEMC. Although there is no general duty to cooperate with a potential competitor, willful refusals to deal made in order to maintain monopoly power without legitimate business reasons are unlawful. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600–05, 105 S.Ct. 2847, 2856–59, 86 L.Ed.2d 467 (1985); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377–79, 93 S.Ct. 1022, 1029–30, 35 L.Ed.2d 359 (1973).

The Plaintiffs' non-pricing claims are more plausible than their other claims. It makes economic sense for a monopolist to refuse to deal with a potential competitor like NCEMC in order to maintain its monopoly power so long as the monopolist does not lose substantial amounts of money in the process. Through the alleged use of

---

**46.** The electricity rate charged to a customer is determined by the cost of producing electricity at all plants which generate electricity and not just one plant.

**47.** The clear trend in predatory pricing cases is to focus on cost evidence rather than direct or circumstantial evidence. Recent decisions have indicated that by itself direct evidence of predatory intent is insufficient to uphold Sherman Act antitrust verdicts for plaintiffs. *See Morgan v. Ponder*, 892 F.2d 1355, 1359 (8th Cir.1989); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1400–02 (7th Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990). Circumstantial evidence is equally disfavored. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57.

**48.** There is no evidence in the record that any of the Plaintiff EDCs objected to the 7.5 mills per kwh rate set by CP & L in 1945. In fact, this rate was the result of negotiations between CP & L, the EDCs, and the REA. At no time did the EDCs object to the 7.5 mills per kwh rate on the ground that it prevented NCEMC from obtaining REA financing for a G & T system. Having enjoyed the benefit of this low rate for twenty-six years, the EDCs cannot press their claim decades later after electricity prices have risen.

monopoly power, CP & L could prevent NCEMC from getting access to the resources it needed to compete in the G & T business. There is nothing implausible, as Plaintiffs' expert puts it, about a monopolist preferring the "quiet life."[49] The factors that make the pricing claims implausible do not apply to the non-pricing claims. Predatory pricing schemes are very costly, while refusing to deal with a potential competitor costs nothing. Furthermore, utility rates are regulated but business decisions about whom to deal with are not.

Implicitly recognizing that the Plaintiffs' non-pricing claims make economic sense, CP & L's plausibility arguments relate only to the Plaintiffs' pricing claims. CP & L's position is that summary judgment should be granted on the non-pricing claims because the Plaintiffs were not damaged by these acts—not that these claims were implausible.[50] The court rejects this position because it ignores the Plaintiffs' request for injunctive relief. Furthermore, the court has already expressed its unwillingness to hold as a matter of law that the Plaintiffs were not damaged by overt acts of CP & L after the statute of limitations cut-off date. *See, supra,* pp. 334–35.

### III. *Standing*

Section 4 of the Clayton Act, 15 U.S.C. § 15, limits standing to bring a private antitrust damage action to those "who shall be injured in [their] business or prop-

erty by reason of anything forbidden in the antitrust laws." Because NCEMC is only a potential competitor in the G & T business it must demonstrate intention and preparedness to enter that business. *See, e.g., Indium Corp. v. Semi-Alloys, Inc.,* 781 F.2d 879, 882 (Fed.Cir.1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986); *Jayco Sys., Inc. v. Savin Business Machines Corp.,* 777 F.2d 306, 313 (5th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986); *Hecht v. Pro–Football, Inc.,* 570 F.2d 982, 987 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).

CP & L argues that none of the Plaintiffs have standing to pursue their damage claims relating to the 7.5 mills per kwh rate because they were not prepared to build a G & T system back in the 1950's and 1960's. Therefore, the Plaintiffs have no business or property interest protected by the antitrust laws. CP & L cites the Plaintiffs' tentative plans and lack of financial backing as evidence of lack of preparedness. The Plaintiffs counter that they were prepared to enter the G & T business several decades ago but were prevented from doing so by CP & L's 7.5 mills per kwh rate. The Plaintiffs point out that two per cent (2%) financing for the construction of a G & T system would have been available from the REA if not for CP & L's predatory rate.[51]

49. *Otter Tail* is instructive. In *Otter Tail,* a dominant utility "attempted to prevent communities in which its retail distribution franchise had expired from replacing it with a municipal distribution system" by instituting litigation designed to delay such a system; refusing to sell at wholesale; refusing to wheel power; and refusing to provide access to its transmission lines. *Id.* 410 U.S. at 368, 93 S.Ct. at 1025. The Supreme Court enjoined this conduct because the "[u]se of monopoly power 'to destroy threatened competition' is a violation ... of § 2 of the Sherman Act." *Id.* at 377, 93 S.Ct. at 1029 (citing *Lorain Journal Co. v. United States,* 342 U.S. 143, 154, 72 S.Ct. 181, 186, 96 L.Ed. 162 [1951]; *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 375, 47 S.Ct. 400, 404, 71 L.Ed. 684 [1927] ).

50. CP & L states "[p]laintiffs also allege that CP & L precluded development of their G & T system by refusing to provide them with various

coordination services, but plaintiffs seek no damages based upon any such alleged refusals." Memorandum of Defendant Carolina Power & Light Company in Support of Motion for Summary Judgment on Grounds of Insufficient Evidence of Monopolization, at 2 n. 1 (July 3, 1986).

51. As mentioned earlier, the REA would lend money for G & T construction only if (1) there was no cheap, dependable source of power available to the rural EDCs, and (2) the rates offered by existing power sources would result in a higher cost of power to the borrowers than the cost of power from G & T facilities financed by the REA. The Plaintiffs contend that the 7.5 mills per kwh rate prevented them from getting a two per cent (2%) REA loan to build their own G & T system because the cost of power from that system would be greater than the alleged below-cost rate CP & L charged them.

The court need not decide this issue. CP & L's standing motion relates solely to the Plaintiffs' preparedness to construct a G & T system during the 1950's and 1960's. The Plaintiffs contend they could not obtain the necessary financing due to CP & L's predatory pricing. Because the court will grant summary judgment to CP & L on all the pricing claims based upon the statute of limitations and sufficiency of the evidence, the Plaintiffs cannot obtain damages or injunctive relief based upon CP & L's 7.5 mills per kwh rate. Therefore, there is no need to resolve the standing issue as it relates solely to the Plaintiffs' pricing claims.

Furthermore, the Plaintiffs clearly have standing to pursue their non-pricing claims based upon acts taking place on or after the statute of limitations cut-off date.[52] The Plaintiffs were prepared to deal with CP & L on a good-faith basis for economical power supply services and had the financial wherewithal to do so.[53]

## IV. *Antitrust Immunity*

CP & L's rate-making activities have been regulated for over fifty years. Prior to 1964, the wholesale electric rates which CP & L charged the EDCs were regulated by the North Carolina Utilities Commission; from 1964 to the present these rates have been regulated by the Federal Power Commission and its successor, the Federal Energy Regulatory Commission. CP & L contends that summary judgment should be entered because the 7.5 mills per kwh rate upon which the Plaintiffs claim damage is immune from the scrutiny of the antitrust laws due to state action immunity[54], implied immunity[55], and the filed-rate doctrine[56]. These immunity doctrines relate solely to the electricity rate-making activities of CP & L. Because the court will dismiss the Plaintiffs' claims relating to the 7.5 mills per kwh rate and the other rate-making activities of CP & L based upon the statute of limitations and the sufficiency of the evidence, the court need not decide the various immunity issues raised by CP & L.[57] The Plaintiffs' claims which remain

**52.** The only gray area relates to the Plaintiffs' claim regarding Electric Power in the Carolinas since those overt acts of CP & L took place both before and after the statute of limitations cut-off date. It is unclear from the evidence before the court whether there were sufficient post-limitations acts of CP & L relating to Electric Power in the Carolinas to establish a viable claim. If there were sufficient acts, the court holds that the Plaintiffs have standing to pursue them because by the early–1970's NCEMC and the EDCs had the financing needed to pursue such projects.

**53.** NCEMC negotiated with Duke Power for power exchange services in the mid–1970's. During these negotiations, Duke Power made it clear that NCEMC would have to put up $200 million in capital in 1975 for serious negotiations to take place. NCEMC ultimately financed a $1.6 billion deal with Duke Power in 1980 when it purchased an interest in Duke Power's Catawba Nuclear Unit.

**54.** Under the doctrine of state action immunity, state regulation can immunize activities otherwise in violation of the antitrust laws if the challenged activities are taken pursuant to a clearly articulated state policy and are actively supervised by the state. *See Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 57, 105 S.Ct. 1721, 1726, 85 L.Ed.2d 36 (1985).

**55.** Under the doctrine of implied immunity, courts can imply immunity from the antitrust

laws when enforcement of those laws would interfere with the operation of a federal regulatory agency. *See, e.g., Gordon v. New York Stock Exch., Inc.,* 422 U.S. 659, 691, 95 S.Ct. 2598, 2615, 45 L.Ed.2d 463 (1975) (stock exchange rules allowing for the fixing of commission rates immune from the antitrust laws since Congress intended to leave the supervision of commission rates to the Securities and Exchange Commission).

**56.** In *Keogh v. Chicago & N.R. Co.,* 260 U.S. 156, 160–62, 43 S.Ct. 47, 48–49, 67 L.Ed. 183 (1922), the Supreme Court decided that because the challenged uniform freight rates were contained in published tariffs filed with the Interstate Commerce Commission they could not be the basis for an award of antitrust damages. More recent cases have narrowed the doctrine. *See City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173 (8th Cir.1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983); *City of Mishawaka v. Indiana & Michigan Elec. Co.,* 560 F.2d 1314 (7th Cir.1977), *cert. denied,* 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978).

**57.** The Plaintiff EDCs cite rate-making activity after August 17, 1973, as part of CP & L's anticompetitive conduct. Rate disputes between the EDCs and CP & L relating to the amount of the rate increase and to the pancaking of rate increases comprise these complained of activities. The EDCs admit that they have already recovered rate overcharges through the regulatory

relate to refusals to deal, refusals to provide power exchange services, and other non-pricing acts by CP & L unrelated to utility rates. Obviously, there is no antitrust immunity for these activities because they are not related to the rate-making of CP & L. Therefore, antitrust immunity provides no basis to dismiss these claims.

## CONCLUSION

For the aforementioned reasons, Defendant CP & L's motion for summary judgment under the statute of limitations will be granted on Plaintiffs' predatory pricing claims and on all of Plaintiffs' non-pricing claims based on acts of the Defendant occurring before August 17, 1973. Defendant's motion for summary judgment on grounds of insufficient evidence also will be granted on Plaintiffs' predatory pricing claims.[58] Plaintiffs' non-pricing claims based on Defendant's alleged anticompetitive acts occurring on or after August 17, 1973, remain. Defendant's motion for summary judgment on grounds of standing and on alternative grounds of state action immunity, implied immunity, and the filed rate doctrine will be dismissed without prejudice.

process. Therefore, the EDCs may not claim damages from the post-August 17, 1973, power rates charged by CP & L.

58. The court's ruling on the insufficiency of the evidence to support Plaintiffs' predatory pricing claims is, of course, an alternative basis for the rejection of these claims.